### HENRY v. A. B. DICK COMPANY.[1]

ON A CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS
FOR THE SECOND CIRCUIT.

No. 20.   Argued October 27, 1911.—Decided March 11, 1912.

Complainant sold his patented machine embodying the invention
claimed and described in the patent, and attached to the machine
a license restriction that it only be used in connection with certain
unpatented articles made by the vendor of the machine; with the
knowledge of such license agreement and with the expectation that
it would be used in connection with the said machine, defendant
sold to the vendee of the machine an unpatented article of the class

---

[1] This case was argued after the death of Mr. Justice Harlan, and
during the absence of Mr. Justice Day (see p. v *ante*). The opinion
of the court was delivered by Mr. Justice Lurton (see p. 11 *post*),
with whom Mr. Justice McKenna, Mr. Justice Holmes and Mr. Jus-
tice Van Devanter concurred; a dissenting opinion was delivered by
Mr. Chief Justice White (see p. 49 *post*,), with whom Mr. Justice Hughes
and Mr. Justice Lamar concurred. After the opinion was delivered,
the plaintiff in error asked leave to file a petition for rehearing, and
*The Attorney General* and *The Solicitor General* filed an application and
brief on behalf of the United States for leave to intervene and for a
rehearing of the cause; both applications were denied.

described in the license restriction. *Held* that the act of defendant constituted contributory infringement of complainant's patent.

This court does not prescribe the jurisdiction of courts, Federal or state, but only gives effect to it as fixed by law.

A suit for infringement which turns upon the scope of the patent and privileges of the patentee thereunder presents a case arising under the patent law.

In determining questions of jurisdiction this court never shirks the responsibility of maintaining the lines of separation defined in the Constitution and the laws made in pursuance thereof.

A patentee who has leased his patent to a licensee under restrictions may waive the tort involved in infringement and sue upon the broken contract; but in that event the case is not one arising under the patent laws and, in absence of diversity of citizenship, a Federal court has no jurisdiction thereof.

Whether the case is one of infringement, of which the Federal court has jurisdiction or of contract of which it has not jurisdiction, is often determined by the remedy which complainant seeks.

The test of jurisdiction is whether complainant does or does not set up a right, title or interest under the patent laws or make it appear that a right or privilege will be defeated by one, or sustained by another, construction of those laws.

Whether a patentee may lawfully impose restrictions on the use of a patent and whether the violation thereof constitutes infringement are questions under the patent law. ·

A patentee may elect to sue his licensee upon the broken contract, or for forfeiture for breach, or for infringement. .

While an absolute and unconditional sale operates to pass the patented article outside of the boundaries of the patent, a patentee may by a conditional sale so restrict the use of his vendee within specific boundaries of time, place or method as to make prohibited uses outside of those boundaries constitute infringement and not mere breach of collateral contract.

The extent of a license to use, which is carried by a sale of a patented article depends upon whether any restrictions were placed upon the sale, and if so what they were, and how they were brought home to the vendee; and where, as in this case, a restriction is plainly placed upon the article itself, a sale carries with it only the right to use within the limits specified, and any other use is an infringing one.

The patent statute is one creating and protecting a true monopoly granted to subserve a broad public policy, and it should be construed so as to give effect to a wise and beneficial purpose.

The monopoly of a patent extends to the right of making, selling and using, and each is a separable and substantial right.

A patentee may exclude others from the use of his invention although he does not use it himself. *The Paper Bag Patent Case*, 210 U. S. 405.

Although a contract in regard to use of a patent may include interstate commerce and restrain interstate trade, if it involves only the reasonable and legal conditions imposed under the patent law, it is not within the prohibitions of the Sherman Act. *Bement* v. *National Harrow Co.*, 186 U. S. 70.

Contributory infringement is the intentional aiding of one person by another in the unlawful making, selling or using of a patented invention.

The larger right of exclusive use of the patentee embraces the lesser one of only permitting the licensee to use upon prescribed conditions.

Courts cannot declare the monopoly created by Congress under authority of the Constitution to be unwise; Congress alone has power to prescribe what restraints shall be imposed.

Where a great majority of the courts to which Congress has committed the interpretation of a law have construed it, so that the line of decisions has become a rule of property, this court should not, in the absence of clear reason to the contrary, overrule those decisions on certiorari, and so held in this case after reviewing the decisions sustaining the rule of contributory infringement.

A bare supposition that an article adapted for use in connection with a patented machine sold under restricted license is to be used in connection therewith will not make the vendor a contributory infringer, but where the article so sold is only adapted to an infringing use, there is a presumption that it is intended therefor.

Questions certified by Circuit Court of Appeals on appeal from 149 Fed. Rep. 424, answered in affirmative.

THE facts, which involve the power of a patentee to enforce a license restriction as to the use of the patented article, and the determination of what constitutes contributory infringement, are stated in the opinion.

*Mr. Arthur v. Briesen*, with whom *Mr. Antonio Knauth* was on the brief, for Henry:.

The attempted restriction on the sale of the article is void at common law. *United States* v. *Sequi*, 10 Pet. 306; *United States* v. *Rodman*, 15 Pet. 130, 139; *Merrifield* v.

*Cobleigh*, 4 Cush. 178. See also *Packard* v. *Ames*, 16 Gray, 327; 6 Am. & Eng. Ency., 438, note 5.

By the common law, the absolute property in the article which passes upon an ordinary sale "denotes a full and complete title and dominion over it," which is incompatible with a continued control over it in some shape, matter or respect by the seller of the article. 2 Kent's Com., 14th ed., 347; 2 Blackstone's Comm., 4th ed., 1, 154, 389, 446; Benjamin on Sales, 6th ed., 746.

The only kind of conditional sale known to our law is a sale in which the transfer of title to the things sold to the purchaser, or his retention of it, is made dependent upon the performance of some condition. The chief point of distinction between a condition subsequent and a covenant is that a breach of the former subjects the estate to a forfeiture; a breach of the latter is a ground for damages. Am. & Eng. Ency. Law, 503; *Jewett* v. *Lincoln*, 14 Maine, 116; *Green* v. *Bennett*, 23 Michigan, 464; and see *Park* v. *Hartman*, 153 Fed. Rep. 24; affirmed, 212 U. S. 588; *Taddy* v. *Sterious*, 1 Chan. 354; *McGruther* v. *Pitcher*, 2 Chan. 306 (1904).

The patent statute does not interfere with the working of the rule of the common law as applied to patented articles which have been sold by the patentee by an absolute sale passing the title, not conditionally, but absolutely. *Wilson* v. *Rousseau*, 4 How. 646; *Bloomer* v. *McQuewan*, 14 How. 539, 549; *Bloomer* v. *Millinzer*, 1 Wall. 340; *Chaffee* v. *Boston Belting Co.*, 22 How. 217–222; *Goodyear* v. *Beverly Rubber Co.*, 1 Cliff. 348, 354; *Mitchell* v. *Hawley*, 16 Wall. 544–547; *Adams* v. *Burke*, 17 Wall. 453; *Webber* v. *Virginia*, 103 U. S. 344, 348; *Paper Bag Cases*, 105 U. S. 766; *Hobbie* v. *Jennison*, 149 U. S. 355; *Morgan Envelope Co.* v. *Albany Paper Co.*, 152 U. S. 425; *Keeler* v. *Standard Folding Bed Co.*, 157 U. S. 659.

It must be admitted, however, that the question, whether a mere notice on the article restricting the right of sale by

conditions as to price, can be enforced under the patent law in the absence of any agreement made by the purchaser, has not been decided by this court. *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, 343, and *Cortelyou* v. *Johnson*, 207 U. S. 196, are not authority, nor is *Bement* v. *Harrow Co.*, but see *Re Brosnaham, Jr.*, 18 Fed. Rep. 62.

If the patentee desires to secure to himself the continued control over the use of the patented article in the hands of others, he may do so by leasing it upon suitable conditions, terminating the lease in case of a breach of the condition or by selling it under conditional sale, providing that upon breach of the condition, the title to the article will revert to the patentee. *Bill Publishing Co.* v. *Smythe*, 27 Fed. Rep. 914.

The leading cases in the courts below, *Button Fastener Co.* v. *Eureka Specialty Co.*, 77 Fed. Rep. 288, and *Cortelyou* v. *Johnson*, 145 Fed. Rep. 933, can be distinguished from the case at bar, as each was rendered upon a proper conditional sale at common law, while in this case no such conditional sale is found; and further, that it was sustainable as an action on contract.

*Edison Phonograph Co.* v. *Kaufmann*, 105 Fed. Rep. 960 was decided upon the supposed authority of *Dickerson* v. *Matheson*, 57 Fed. Rep. 524, and *Dickerson* v. *Tingling*, 84 Fed. Rep. 192, 195, but there is no true analogy between a purchase in a foreign country and importation of the article into this country, treated in those cases and a purchase from the patentee in this country under "restrictions," and see also *Edison Phonograph Co.* v. *Pike*, 116 Fed. Rep. 863.

In view of the statements of this court in the more recent decision of *Bobbs-Merrill Co.* v. *Straus, supra*, the statement of Judge Lowell concerning the approval by this court of the broad doctrines laid down in the *Button Fastener Case* must be considered doubtful; see *Green* v. *Bennett*, 23 Michigan, 464; 6 Am. & Eng. Ency. 437.

If the sale is to be considered a conditional sale which

can be rescinded upon breach of the condition, the seller cannot rescind the contract and at the same time retain the benefits of the contract. He must, as a condition precedent to rescission, restore or offer to restore the price paid for the goods. 35 Cyc. 144.

That this is not a suit arising under the patent statute, but one arising from the contract and having for its object the enforcement of the contract seems manifest both on principle and on authority. *Excelsior Pipe Co.* v. *Pacific Bridge Co.*, 185 U. S. 282.

The license restriction is void because unreasonable and tending to create an unlawful, permanent monopoly in the patentee in something which is not protected by his patent.

The notice of restriction is not connected with any patent or patents, nor is there any time limit stated as to the obligation of the purchaser of the machine to buy the supplies for it only from the complainant, which supplies are not even completely enumerated, and may comprise oil, blotting paper, rollers, copying paper, and anything else which may be useful in the handling of the machine. *Cortelyou* v. *Johnson,* 145 Fed. Rep. 933; *Morgan Envelope Co.* v. *Albany Paper Co.*, 152 U. S. 425.

Machines like the mimeograph are not purchased with the amount of care and circumspection with which a piece of real estate is purchased; they are ordinary articles of trade like any other hand machines and the purchaser very likely either pays no attention to the notice of restriction, or if he does see it, will think that it is impossible to insist on such a condition, because the maker of the machines cannot possibly follow them into the hands of many thousands of purchasers to watch over their use.

A court of equity should never by injunction imply obligations on one party, when there are no clear and definite obligations imposed upon the other party to the contract. *Lawrence* v. *Dixey*, 119 App. Div. (N. Y.) 295; *Chicago Railroad Company* v. *Dane*, 43 N. Y. 240; *Rafolo-*

*vitz* v. *American Tobacco Co.*, 73 Hun, 87; *Jackson* v. *Alpha Portland Cement Company*, 122 App. Div. (N. Y.) 345.

*Mr. Frederick P. Fish*, with whom *Mr. Samuel Owen Edmonds* was on the brief, for A. B. Dick Co.:

Under Art. I, § 8, of the Constitution, Congress is given power to promote the progress of science and useful arts by securing to inventors, for limited terms, the "exclusive" right to their discoveries. Accordingly, § 4884 of the Revised Statutes provides that the grant of a patent shall vest in the patentee "the exclusive right to make, use and vend the invention or discovery." This is, in effect, the grant of three separable substantial rights, each vested exclusively in the patentee. *Bloomer* v. *McQuewan*, 14 How. 538; *Adams* v. *Burke*, 17 Wall. 453.

A patentee is under no obligation to exercise any of the exclusive rights covered by his grant. Doing nothing thereunder himself he may still, during the patent term, exclude others from making, or using, or selling the patented thing. *Paper Bag Patent Case*, 210 U. S. 405; *Bement* v. *Harrow Co.*, 186 U. S. 70. This is an incident of his ownership, for a limited period, of a true but lawful monopoly authorized by the Constitution and statute. *Wilson* v. *Rousseau*, 4 How. 674; *Button Fastener Case*, 77 Fed. Rep. 294.

If, on the other hand, the patentee elect to exercise the rights so vested in him exclusively by the grant of the patent, it rests with him, and with him only, to determine the manner in which the value of those rights shall be realized. He may manufacture, or use, or sell the patented thing, or he may license others to do these things or any of them. Having the right wholly to exclude others, he may waive it to such extent and for such consideration as he sees fit. Cases *supra.*

If the patentee elect not to manufacture, he may retain the machine so made and himself exclusively enjoy its use.

Or, on such terms and under such conditions as he sees fit to impose, he may waive his exclusive right of use or some particular part of it, and permit such use by others to a definite extent, fixed by agreement. If he sell the machine outright and unconditionally, it passes out from under the patent monopoly, which thenceforth is ineffective to control its use. On the other hand, if he sell it conditionally or under license governing its use, the patentee thereby carves out from his exclusive right of use, and transfers, merely a limited right to use the patented machine in the manner which the license prescribes. Such use is protected by the patent. Any other use violates it and constitutes infringement. *Providence Rubber Co.* v. *Goodyear,* 9 Wall. 788; *Mitchell* v. *Hawley,* 16 Wall. 544; *Birdsell* v. *Shaliol,* 112 U. S. 485; *Bement* v. *Harrow Co., supra.*

The market for standard and unpatented articles is established. That for a patented article the patentee must create. The particular method selected must be such as will bring him his return within the limited term of the patent. Outright sale at high price limits the market, injuring both patentee and public. Accountings in the form of rental or according to quantum of product are vexatious. When the method satisfies both patentee and public, it does not lie in the mouth of a stranger to the transaction to complain.

On all sales of patented articles a license to use is a necessity. In the case of an outright sale, such license is *implied. Adams* v. *Burke, supra.* In the case of a sale under conditions governing use, the license, as in the case at bar, is *express.* Attack upon such a license assails the freedom of the parties to contract with respect to the patent monopoly. *Button Fastener Case, supra.*

The complainant-appellee, A. B. Dick Company, owner of the patents covering the rotary mimeograph, had the right to exclude all others from using those machines in any manner whatever. It might lawfully have withheld

·them from the public until the expiration of the patents. It was quite within its rights, therefore, when it sold its machines under license restriction precluding lawful use thereof save with supplies (such as ink) of its own manufacture. Operating under such license, the vendees shared the patent. monopoly with the patentee. Operating in defiance of it, they ·violated that monopoly.

Unlicensed use, even the threat of unlicensed use, of a patented. machine constitutes infringement. And one who aids or abets such infringement, as by knowingly furnishing the means for the unlicensed use and thereby procuring such use, is liable as a tort-feasor and equally guilty of infringement. Suit, under the patent, lies against either or both the direct and the contributory infringer. *Button Fastener Case, supra; Kalem Co.* v. *Harper Bros.,* 222 U. S. 55.

The license in question is reasonable and necessary for the protection of the parties. The machines were sold at cost. They were therefore purchased by many who, had a manufacturing profit been added, would have been unable to enjoy the patented inventions. The patentee's profits on the supplies represented royalty; this accrued only in proportion to the licensee's use of his machine. An accounting on any other basis would have been vexatious to both parties. By using the patentee's specially adapted supplies, licensees obtained work of high quality and the reputation and prestige of the machine were preserved.

The injunction granted below does not stop the defendants from selling supplies but from procuring the licensees to infringe by selling such supplies to them, with knowledge of their license and with intent that the same shall be violated by the unlawful use of such supplies upon their licensed machines.

There is no substance. in the suggestion that the license plan in question expands the scope of the patent, making it cover articles otherwise unpatented and possibly un-

patentable.   If this were true, complainant would have the exclusive right to manufacture, use and sell the ink complained of.   It claims no such right.   All it claims is the right to make the ink which its licensees agreed to use when they employ the patented machines.

Equally without foundation is the suggestion as to monopolizing unpatented articles.   The public never had the right to sell supplies for use on the patented machines. This being true, it is deprived of no right when complainant licenses the use of those machines only with its own supplies.   Except where the use of the supplies will constitute or procure a tort, the public is as free to make and sell them to-day as it ever has been.

As to the fanciful suggestions concerning what other patentees may do in the way of imposing license restrictions, these are without weight or persuasiveness.   If a restriction be unduly onerous or burdensome, one who would otherwise become a licensee may decline the license. He is not compelled to purchase.   The whole matter is, *ex necessitate*, self-regulating.   The public is safeguarded by the self-interest of the patentee, who can be depended upon not to throttle his market by imposing burdensome restrictions.

Additional authorities urged in complainant's behalf are *National Phonograph Co.* v. *Schlegel*, 128 Fed. Rep. 733; *Rubber Tire Case*, 154 Fed. Rep. 358; *Indiana Co.* v. *Case Co.*, 154 Fed. Rep. 365; *Æolian Co.* v. *Juelg*, 145 Fed. Rep. 939, and 155 Fed. Rep. 119; *Brodrick* v. *Mayhew*, 131 Fed. Rep. 92, and 137 Fed. Rep. 596; *Brodrick* v. *Roper*, 124 Fed. Rep. 1019; *Commercial Co.* v. *Autolox Co.*, 181 Fed. Rep. 387; *Cortelyou* v. *Lowe*, 111 Fed. Rep. 1005; *Cortelyou* v. *Carter's Ink Co.*, 118 Fed. Rep. 1022; *Cortelyou* v. *Johnson*, 138 Fed. Rep. 110; *Crown &c. Co.* v. *Brooklyn &c. Co.*, 172 Fed. Rep. 225; *Same* v. *Standard Brewery*, 174 Fed. Rep. 252; *Dick Co.* v. *Milwaukee Co.*, 168 Fed. Rep. 930; *Edison* v. *Kaufmann*, 105 Fed. Rep. 960; *Same*

v. *Pike*, 116 Fed. Rep. 863; *New Jersey Co.* v. *Schaefer*, 144 Fed. Rep. 437, 159 Fed. Rep. 171, and 178 Fed. Rep. 276; *New Jersey Co.* v. *Weinberg*, 183 Fed. Rep. 588; *Rupp* v. *Elliott*, 131 Fed. Rep. 730; *Victor Co.* v. *The Fair*, 123 Fed. Rep. 424. The English authorities are cited in the decision of the Privy Council in *National Phonograph Co.* v. *Menck*, 27 T. L. R. 239.

MR. JUSTICE LURTON delivered the opinion of the court.

This cause comes to this court upon a certificate under the sixth section of the Court of Appeals Act of March 31, 1891.

The facts and the questions certified, omitting the terms·of the injunction awarded by the Circuit Court, are these:

"This action was brought by the complainant, an Illinois corporation, for the infringement of two letters patent, owned by the complainant, covering a stencil-duplicating machine known as the 'Rotary Mimeograph.' The defendants are doing business as co-partners in the City of New York. The complainants sold to one Christina B. Skou, of New York, a Rotary Mimeograph embodying the invention described and claimed in said patents under license which was attached to said machine, as follows:

"LICENSE RESTRICTION.

"This machine is sold by the A. B. Dick Co. with the license restriction that it may be used only with the stencil paper, ink and other supplies made by A. B. Dick Company, Chicago, U. S. A.

"The defendant, Sidney Henry, sold to Miss Skou a can of ink suitable for use·upon said mimeograph with knowledge of the said license agreement and with the expectation that it would be used in connection with

said mimeograph. The ink sold to Miss Skou was not covered by the claims of said patent."

"QUESTION CERTIFIED.

"Upon the facts above set forth the question concerning which this court desires the instruction of the Supreme Court is:

"Did the acts of the defendants constitute contributory infringement of the complainant's patents?"

There could have been no contributory infringement by the defendants, unless the use of Miss Skou's machine with ink not made by the complainants would have been a direct infringement. It is not denied that she accepted the machine with notice of the conditions under which the patentee consented to its use. Nor is it denied that thereby she agreed not to use the machine otherwise. What defendants say is that this agreement was collateral, and that its validity depended upon principles of general law, and that if valid the only remedy is such as is afforded by general principles of law. Therefore, they say that the suit is not one arising under the patent law, and one not cognizable in a Federal court, unless diversity of citizenship exists.

But before coming to the question whether this is a suit of which the Circuit Court had jurisdiction as a suit arising under the patent law, it may be well to notice an argument against jurisdiction based upon the suggestion that if a breach of such a license restriction will support a suit for infringement, direful results will follow. Chief among the results suggested are, an encroachment upon the authority of the state courts and an extension of the jurisdiction of the Federal courts. And to swell the grievance it is said that if it be held that a breach of such a restriction will support a suit for infringement, parties will be deprived of the right to have the validity and import of the license restriction determined by the general law,

and be compelled to have their rights determined by the patent law.

We are unable to assent to these suggestions. We do not prescribe the jurisdiction of courts, Federal or state, but only give effect to it as fixed by law. If a bill asserts a right under the patent law to sell a patented machine subject to restrictions as to its use, and alleges a use in violation of the restrictions as an infringement of the patent, it presents a question of the extent of the patentee's privilege, which, if determined one way, brings the prohibited use within the provisions of the patent law, or, if determined the other way, brings into operation only principles of general law. Obviously, a suit for infringement, which must turn upon the scope of the monopoly or privilege secured to a patentee, presents a case arising under the patent law. The jurisdiction of the Circuit Court over such cases has, for more than a century, been *exclusive*, by the express terms of the statute, although, for the most part, its jurisdiction over other kinds of suits arising under the Constitution and laws of the United States is only concurrent with that of the state courts.

The suggestion, therefore, that we should refrain from ruling that a patentee may sell a patented machine subject to restrictions as to its use, and may predicate infringement upon a use in violation of the restrictions lest such a ruling may draw to the Federal courts cases which otherwise would not come to them, cannot be sustained without placing our decision upon considerations which are quite apart from the law. This, of course, we may not do. In determining questions of jurisdiction, this court has never shirked the responsibility of maintaining the lines of separation defined in the Constitution and the laws made in pursuance thereof, but, on the contrary, has been ever watchful to maintain those lines as obligatory alike upon all courts and all suitors.

We come, then, to the question, whether a suit for infringement is here presented.

That the license agreement constitutes a contract not to use the machine in a prohibited manner, is plain. That defendants might be sued upon the broken contract, or for its enforcement or for the forfeiture of the license, is likewise plain. But if by the use of the machine in a prohibited way Miss Skou infringed the patent, then she is also liable to an action under the patent law for infringement. Now that is primarily what the bill alleged, and this suit is one brought to restrain the defendants as aiders and abettors to her proposed infringing use.

That the patentee may waive the tort and sue upon the broken contract, or in assumpsit, is elementary. Robinson on Patents, §§ 1225, 1250, and notes; *Steam Stone Cutter Co.* v. *Sheldons*, 15 Fed. Rep. 608; *Pope Mfg. Co.* v. *Owsley*, 27 Fed. Rep. 100; *Button Fastener Cases*, 77 Fed. Rep. 288, 291; *Wilson* v. *Sandford*, 10 How. 99. But if the patentee elect to waive the tort and sue upon the covenants or for a breach of contract, the suit would not be one dependent upon or arising out of the patent law, and a Federal court would have no jurisdiction unless diversity of citizenship existed. Robinson on Patents, § 1250; *Magic Ruffle Co.* v. *Elm City Co.*, 13 Blatchf. 151; *Goodyear* v. *Union India Rubber Co.*, 4 Blatchf. 63; *Goodyear* v. *Congress Rubber Co.*, 3 Blatchf. 449. This would be so although the damages for a breach would be measured by the loss resulting from the infringement. *Magic Ruffle Co.* v. *Elm City Co.*, 13 Blatchf. 151. After such a recovery in assumpsit, no further damages for the infringement can be claimed. *Steam Stone Cutter Co.* v. *Sheldons*, 15 Fed. Rep. 608.

The remedy which the complainant seeks may often determine whether the suit is one arising under the patent law and cognizable only in a court of the United States, or one upon a contract between the patentee and his assigns or licensees, and, therefore, cognizable only in a

state court, unless there be diversity of citizenship. Thus, a bill to enforce a contract concerning the title to a patent, or an interest therein, or to declare a forfeiture of an assignment of an interest in a patent, or even a license to make, sell or use the patented thing, or an action to recover damages for a breach of a contract relating to a patent or a license thereunder, would not, because of the character of remedy or relief sought, be a suit cognizable in a United States court, although the facts stated might have justified a suit for infringement in a United States court, if the complainant had elected that remedy. To sustain the contention that a breach of the implied agreement not to use the machine in question except in a particular way might have supported a suit to forfeit the license, or an action for damages upon the broken contract, counsel have cited and commented at great length upon the cases of *Wilson* v. *Sandford,* 10 How. 99; *Dale Tile Mfg. Co.* v. *Hyatt,* 125 U. S. 46; *Albright* v. *Teas,* 106 U. S. 613; *Hartell* v. *Tilghman,* 99 U. S. 547; *Pratt* v. *Paris Gaslight & Coke Co.,* 168 U. S. 255; *Keeler* v. *Standard Folding Bed Co.,* 157 U. S. 659, and *Bement* v. *National Harrow Co.,* 186 U. S. 70; but an examination of these cases will disclose that while in some of them a suit for infringement might have been brought, the complainants had in fact brought suits to set aside or enforce contracts relating to patents, or licenses under patents. They were, therefore, not "Patent cases," but cases determinable upon principles of general law. In *Excelsior Wooden Pipe Co.* v. *Pacific Bridge Co.,* 185 U. S. 282; Mr. Justice Brown reviews the cases and shows so plainly why they were not patent cases that we shall only refer to that opinion.

To support their contention that the only remedy for a violation of the license under which Miss Skou acquired her machine is one in the state courts, counsel quote a paragraph from the same opinion in these words: "Now, it may be freely conceded that if the licensee had failed to

observe any one of the three conditions of the license, the licensor would have been obliged to resort to the state courts, either to recover the royalties or to procure a revocation of the license. Such suit would not involve any question under the patent law." But the three conditions of the license there referred to were: First, to pay royalties; second, that the transferee would not transfer or assign the license without consent of the licensor; third, that the failure to use the license in the manufacture of pipe should operate to revoke it. It is evident that the licensee would not have infringed the patent by either failing to pay royalties, by assigning the license, or by neglecting to use his privilege. The licensor would clearly have been compelled to rely wholly upon his contract, as such, in any suit for the violation of any of the conditions named.

The test of jurisdiction is this: Does the complainant "set up some right, title or interest under the patent laws of the United States, or make it appear that some right or privilege will be defeated by one construction, or sustained by another, of those laws?" *Excelsior Wooden Pipe Co.* v. *Pacific Bridge Co.*, 185 U. S. 282; *Pratt* v. *Paris Gaslight & Coke Co.*, 168 U. S. 255, 259; *White* v. *Rankin*, 144 U. S. 628.

The bill alleges that the complainant's patent has been infringed by the breach of the conditions upon which the patented machine was sold. The remedy it seeks is an injunction against indirect infringement by the defendants. The facts stated upon the face of the bill may be insufficient to show an infringement of the patent; but the right to treat the conduct of the defendants as an indirect infringement is a right which the complainant sets up as arising under the patent law. One construction of the scope of the grant will sustain the rights asserted, if the facts be as alleged, and another will defeat those rights.

Whether a patentee may lawfully impose such restrictions, and whether their violation constitutes an infringement, are obviously questions arising under the patent law. In *Littlefield* v. *Perry*, 21 Wall. 205, 222, this court said: "An action which raises a question of infringement is an action arising 'under the law,' and one who has the right to sue for the infringement may sue in the Circuit Court. Such a suit may involve the construction of a contract as well as the patent, but that will not oust the court of its jurisdiction. If the patent is involved it carries with it the whole case."

Although the complainant might have sued upon the broken contract, or brought a bill to declare a forfeiture of the licensee's rights for breach of the implied covenant to operate it only in connection with materials supplied by it, it has elected to sue for infringement. To quote from Judge Shipman's opinion in *Magic Ruffle Co.* v. *Elm City Co.*, 13 Blatchf. 151, "It was competent for the complainants to take either one of the two remedies. . . . They could bring a bill alleging an injury to their exclusive rights under the laws of the United States, or, as the residence of the parties gave this court jurisdiction, could bring a proper suit, setting up a breach of the contract as the gravamen of their action."

That a patentee may effectually restrict the time, place or manner of using a patented machine, so that a prohibited use will constitute an infringement of the patent, is fully conceded. Thus, in the printed brief counsel for defendants say: "Aside from such special contracts, an agreement that the article shall be used only in a certain manner, can be made only by way of lease of the article, terminating the lease upon condition broken, or by way of conditional sale, by breach of which the title reverts to the seller." In either such case, counsel say, "a use of the article in violation of the condition may terminate the lease or sale of the article

(which) would become the property of the patentee again, and a use thereof by the lessee or purchaser may constitute a violation of the patent, for which an infringement may lie. . . . He cannot make a sale with the condition attached that the article shall be used or disposed of in a certain manner, leaving the title, however, in the purchaser in case of a breach of the condition."

The books abound in cases upholding the right of a patentee owner of a machine to license another to use it subject to any qualification in respect of time, place, manner or purpose of use which the licensee agrees to accept. Any use in excess of the license would obviously be an infringing use and the license would be no defense. Robinson on Patents, §§ 915, 916 and notes. This is so elementary we shall not stop to cite cases.

The contention is not that a patentee may not permit the use of a patented thing with such qualifications as he sees fit to impose, and that a prohibited use will be an infringing one, but that he can only keep the article within the control of the patent by retaining the title. To put the contention in another form—it is, that any transfer of the patentee's property right in a patented machine carries with it the right to use the entire invention so long as the identity of the machine is preserved, irrespective of any restrictions placed by the patentee upon the use of the article and accepted by the buyer. It is said that by such a sale the patentee "disposes of all his rights under his patent, and thereby removes the article from the operation of the patent law." If he attempts to sell the machine for specified uses only and prohibit all others, the restriction is disposed of as constituting a collateral agreement such as any vendor of personal property might impose, and enforceable, if valid at all, only as a collateral contract.

The issue is a plain one. If it be sound, it concludes the case, and our response should be a negative one, since

the violation of a mere collateral contract, which is not also an infringement of the patent would not be a case arising under the patent law. But is it true that where a patentee sells his patented machine for a specific and limited use, he does not thereby reserve to himself, as patentee, the exclusive right to all unpermitted uses which may be made of his invention as embodied in the machine sold? Obviously, this is a question arising under the patent law. By a sale of a patented article subject to no conditions the purchaser undeniably acquires the right to use the article for all the purposes of the patent so long as it endures. He may use it where, when, and how he pleases, and may dispose of the same unlimited right to another. This has long been the settled doctrine of this and all patent courts. *Mitchell* v. *Hawley*, 16 Wall. 544; *Livingston* v. *Woodworth*, 14 How. 546, 550; *Adams* v. *Burks*, 17 Wall. 453, 456; *Folding Bed Case* (*Keeler* v. *Standard Folding Bed Co.*), 157 U. S. 659, 666. By such an unconditional sale of the thing patented it is said to be "no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress."

In the cases cited above, as well as in the leading case of *Bloomer* v. *McQuewan*, 14 How. 539, the statement that a purchaser of a patented machine has an unlimited right to use it for all the purposes of the invention, so long as the identity of the machine is preserved, was made of one who bought unconditionally, that is, subject to no specified limitation upon his right of use. The question of the effect of limitations upon the right of use arose, however, in *Mitchell* v. *Hawley*, and there we find the distinction was deemed material and the effect declared.

In that case one Taylor was the patentee, under a grant for a term of fourteen years, for a machine for felting hats. By what Mr. Justice Clifford calls "a conveyance of license, subject to certain restrictions or limitations,"

one Bayley was given the "exclusive right to make and
use and to license to others the right to use the said ma-
chines in the States of Massachusetts and New Hampshire,
during the remainder of the original term of said letters-
patent," subject to a stipulation that "the licensee shall
not in any way, or form, dispose of, sell, or grant any
license to use the said machines beyond the expiration
of the original term." There was also a provision that if
the term of the patent should be extended Bayley should
have the right to control the same in those two States,
upon paying a reasonable compensation, etc.

Bayley, as such licensee, made and sold four machines
to the appellant Mitchell, with the right to use them for
felting hats in the town of Haverhill, Massachusetts,
"under Taylor's patent bearing date May 3, 1864."
Before the patent expired it was extended for the further
term of seven years, the benefits of which extension for
the said two States were assigned to the appellee Hawley.
Hawley then filed his bill to restrain Mitchell from using
the four identical machines which had been sold to him by
Bayley. From a decree restraining their further use
Mitchell appealed. Mr. Justice Clifford, before stating
the facts upon which the judgment must rest as to the
right of Mitchell as the purchaser of the machines to con-
tinue their use after the expiration of the original term of
Taylor's patent, and after directing attention to what he
termed "the well-grounded distinction between the grant
of the right to make and vend the patented machine and
the grant of the right to use it," which, he says, "was
first satisfactorily pointed out by the late Chief Justice
Taney, with his accustomed clearness and precision,"
says (p. 548):

"Purchasers of the exclusive privilege of making or
vending the patented machine hold the whole or a portion
of the franchise which the patent secures, depending upon
the nature of the conveyance, and of course the interest

which the purchaser acquires terminates at the time limited for its continuance by the law which created the franchise, unless it is expressly stipulated to the contrary. But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life stands on different grounds, as he does not acquire any right to construct another machine either for his own use or to be vended to another for any purpose. Complete title to the implement or machine purchased becomes vested in the vendee by the sale and purchase, but he acquires no portion of the franchise, as the machine, when it rightfully passes from the patentee to the purchaser, ceases to be within the limits of the monopoly."

In the succeeding paragraph he, in effect, limits what was above said to unconditional sales of such patented machines by adding this:

"Patented implements or machines sold to be used in the ordinary pursuits of life become the private individual property of the purchasers, and are no longer specifically protected by the patent laws of the State where the implements or machines are owned and used. Sales of the kind may be made by the patentee with or without conditions, as in other cases, but where the sale is absolute, and without any conditions, the rule is well settled that the purchaser may continue to use the implement or machine purchased until it is worn out, or he may repair it or improve upon it as he pleases, in same manner as if dealing with property of any other kind."

The force and bearing of this opinion cannot be escaped by suggesting that the court was referring to mere common-law contractual conditions, for the suit was to restrain infringement by the use of four machines which had been sold, *not leased.*

That the bill was one alleging and seeking to enjoin further use as an infringement of the patent is shown by the statement that "they," referring to the purchaser

Mitchell and those associated with him, "appeared to the
suits and filed an answer setting up as a defense to the
charge of infringement that they are by law authorized
to continue the use of the four machines just the same
under the extended letters-patent as they had the right
to do under the original patent, when the purchase was
made by those under whom they claim, which is the only
question in the case."

The question argued, as shown by the brief, as set out
in the report, was there, as here, that by a sale of the
machines "they were taken out of the reach of the patent
law altogether, and that as long as the machines them-
selves lasted, the owner could use them." For the patentee
it was urged that "the right to make and use and to license
others to use was expressly limited by apt words, showing
clearly an intent that it should not survive the original
term of the patent." This latter was the argument which
prevailed. Mr. Justice Clifford, after referring to the
principle of law that one cannot convey a better title or
right than he has, said (p. 550), touching the restriction
imposed by Bayley on the machines sold by him to
Mitchell: "The form of the license which he gave to the
purchasers shows conclusively that he understood that he
was not empowered to give a license which should extend
beyond that limitation." Later, referring to this sale
with license to use, the learned Justice says (p. 551):
"The terms of the license which the seller gave to the
purchasers were sufficient to put them upon inquiry, and
it is quite obvious that the means of knowledge were at
hand, and that if they had made the least inquiry they
would have ascertained that their grantor could not give
them any title to use the machine beyond the period of
fourteen years from the date of the original letters-patent,
as he was only a licensee and never had any power to sell a
machine so as to withdraw it indefinitely from the opera-
tion of the franchise secured by the patent."

The distinction between the sale of a machine free from specific restrictions upon the right of use and a sale subject to such limitations becomes the more evident, in view of the fact that but for the license to use only for the remainder of the original patent term the purchaser would have acquired the right to continue the use during an extended term of the same patent. This was the express holding in the two prior cases of *Wilson* v. *Rousseau*, 4 How. 646, and *Bloomer* v. *McQuewan*, 14 How. 539, where the unlimited right of use by an unconditional purchaser was laid down in the strongest terms, and which cases are now relied upon by counsel in this case as equally applicable to a sale subject to a restricted use.

It is obvious that if Taylor, the patentee, could authorize Bayley to make and sell the patented machines, subject to the restriction that he should not sell for use beyond the terms of the original patent, and that a purchaser of the machines so made and sold by Bayley, with notice, would infringe the extended patent by a use after the original term had expired, it is because the exclusive right of the patentee embraces the right to make and sell patented machines subject to restrictions upon the right of use, which, if not observed, will support an action for infringement.

An absolute and unconditional sale operates to pass the patented thing outside the boundaries of the patent, because such a sale implies that the patentee consents that the purchaser may use the machines so long as its identity is preserved. This implication arises, first, because a sale without reservation, of a machine whose value consists in its use, for a consideration, carries with it the presumption that the right to use the particular machine is to pass with it. The rule and its reason is thus stated in Robinson on Patents, § 824: "The sale must furthermore be unconditional. Not only may the patentee impose conditions limiting the use of the patented article,

upon his grantees and express licensees, but any person having the right to sell·may at the time of sale restrict the use of his vendee within specific boundaries of time or place or method, and these will then become the measure of the implied license arising from the sale."

The argument for the defendants ignores the distinction between the property right in the materials composing a patented machine, and the right to use for the purpose and in the manner pointed out by the patent. The latter may be and often is the greater element of value, and the buyer may desire it only to apply to some or all of the uses included in the invention. But the two things are separable rights. If sold unreservedly the right to the entire use of the invention passes, because that is the implied intent; but this right to use is nothing more nor less than an unrestricted license presumed from an unconditional sale. A license is not an assignment of any interest in the patent. It is a mere permission granted by the patentee. It may be a license to make, sell and use, or it may be limited to any one of these separable rights. If it be a license to use, it operates only as a right to use without being liable as an infringer. If a licensee be sued, he can escape liability to the patentee for the use of his invention by showing that the use is within his license. But if his use be one prohibited by the license, the latter is of no avail as a defense. As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee. Robinson on Patents, §§ 806, 808.

We repeat. The property right to a patented machine may pass to a purchaser with no right of use, or with only the right to use in a specified way, or at a specified place, or for a specified purpose. The unlimited right of exclusive use which is possessed by and guaranteed to the patentee will be granted if the sale be unconditional. But if the right of use be confined by specific restriction, the use not permitted is necessarily reserved to the patentee.

If that reserved control of use of the machine be violated, the patent is thereby invaded. This right to sever ownership and use is deducible from the nature of a patent monopoly and is recognized in the cases.

In *Sawin* v. *Guild*, 1 Gall. 485, Mr. Justice Story, as far back as 1813, recognized the distinction by holding that a sale of patented machines under an execution against the patentee did not render the sheriff liable under a statute which made any person liable who should sell a patented device without consent of the patentee, because the sheriff had merely sold the materials and had not undertaken to pass any right of use. But in *Wilder* v. *Kent*, 15 Fed. Rep. 217, it was held that under such an execution sale there passed whatever right of use the debtor had if the sale was unconditional.

Judge Lowell, in *Porter Needle Co.* v. *National Needle Co.*, 17 Fed. Rep. 536, after saying that an absolute and unqualified sale of a patented machine carried with it the right of use, said: "But the mere value of a patented machine is often, as is proved to be in this case, insignificant in comparison with the value of its use; and the courts have permitted a severance of ownership and right of use, if the patentee has chosen to dissever them and if his intent is not doubtful."

It is plain from the power of the patentee to subdivide his exclusive right of use that when he makes and sells a patented device that the extent of the license to use which is carried by the sale must depend upon whether any restriction was placed upon the use and brought home to the person acquiring the article.

That here the patentee did not intend to sell the machine made by it subject to an unrestricted use is of course undeniable from the words upon the machine, viz.:

"LICENSE RESTRICTION."

"This machine is sold by the A. B. Dick Co., with the

license restriction that it may be used only with the stencil, paper, ink and other supplies made by A. B. Dick Co."

The meaning and purpose of this restriction was that while the property in the machine was to pass to the purchaser, the right to use the invention was restricted to use with other articles required in its practical operation, supplied by the patentee. It was stated at the bar, and appears fully in the opinion of Judge Ray (149 Fed. Rep. 424), who decided the case in the Circuit Court, that the patentee sold its machines at cost, or less, and depended upon the profit realized from the sale of other non-patented articles adapted to be used with the machine, and that it had put out many thousands of such machines under the same license restriction. Such a sale, while transferring the property right in the machine, carries with it only the right to use it for practicing the invention according to the terms of the license. To no other or greater extent does the patentee consent to the use of the machine. When the purchaser is sued for infringement by using the device, he may defend by pleading, not the general and unlimited license which is carried by an unconditional sale, but the limited license indicated by the metal tablet annexed to the machine. If the use is not one permitted, it is plainly an infringing use.

If, then, we assume that the violation of restrictions upon the use of a machine made and sold by the patentee may be treated as infringement, we come to the question of the kind of limitation which may be lawfully imposed upon a purchaser.

To begin with, the purchaser must have notice that he buys with only a qualified right of use. He has a right to assume, in the absence of knowledge, that the seller passes an unconditional title to the machine, with no limitations upon the use. Where, then, is the line between a lawful and an unlawful qualification upon the use? This is a question of statutory construction. But with what eye

shall we read a meaning into it? It is a statute creating and protecting a monopoly. It is a true monopoly, one having its origin in the ultimate authority, the Constitution. Shall we deal with the statute creating and guaranteeing the exclusive right which is granted to the inventor with the narrow scrutiny proper when a statutory right is asserted to uphold a claim which is lacking in those moral elements which appeal to the normal man? Or shall we approach it as a monopoly granted to subserve a broad public policy, by which large ends are to be attained, and, therefore, to be construed so as to give effect to a wise and beneficial purpose? That we must neither transcend the statute, nor cut down its clear meaning, is plain. In *Bement* v. *National Harrow Co.*, 186 U. S. 70, 89, 90, 91 and 92, this court quoted with approval the language of Chief Justice Marshall in *Grant* v. *Raymond*, 6 Pet. 218, 241. Concerning the favorable view which the law takes as to the protection extended to the exclusive right, the court, through Chief Justice Marshall, said:

"It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made; and to execute the contract fairly on the part of the United States, where the full benefit has been actually received, if this can be done without transcending the intention of the statute, or countenancing acts which are fraudulent or may prove mischievous. The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive. The full benefit of the discovery, after its enjoyment by the discoverer for fourteen years, is preserved, and for his exclusive enjoyment of it during that time the public faith is pledged."

If the patent be for a machine, the monopoly extends to the right of making, selling and using, and these are

separable and substantial rights. In *Bloomer* v. *McQuewan*, 14 How. 539, 547, it is said that the grant is of "the right to exclude every one from making, using or vending the thing without the permission of the owner." In *Bement* v. *National Harrow Co.*, 186 U. S. 70, 90, there was involved the legality of certain contracts between patentees of and dealers in patented harrows. The purpose and effect of the combination and of the contracts between the parties was to fix and keep up the prices at which licensees might sell the patented harrows. It was claimed that the combination and contracts were obnoxious to the Sherman Act; but, upon the other side, it was said that as the contracts concerned only the sale of patented articles that act did not apply. The character of the monopoly granted under the patent act was therefore involved. Touching the right of the patentee to exclude all others from the use of his invention, the court quoted with approval what was said in the *Button Fastener Cases*, 77 Fed. Rep. 288, as follows:

"If he sees fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own. That the grant is made upon the reasonable expectation that he will either put his invention to practical use or permit others to avail themselves of it upon reasonable terms, is doubtless true. This expectation is based alone upon the supposition that the patentee's interest will induce him to use, or let others use, his invention. The public has retained no other security to enforce such expectations. A suppression can endure but for the life of the patent, and the disclosure he has made will enable all to enjoy the fruit of his genius. His title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it."

In the *Paper Bag Patent Case*, 210 U. S. 405, this right to exclude others from all use of the invention was held to be so comprehensive that a patentee was allowed to restrain, by injunction, one who was infringing his patent, although he had, during a long term of years, neither used his invention himself, nor allowed others to use it.

That there are limitations upon the right of vending and using a patented machine may be conceded. Thus, if the thing patented belong to a class of things which on account of their inherent danger to the public safety or health cannot be sold or used because prohibited by an exertion of the police power of a State, they will not be immune to such a law because patented. Upon this ground a patent for "an improved burning oil," was held not to take the article without the operation of a state statute forbidding the sale of oil which was unsafe for illuminating purposes. *Patterson* v. *Kentucky*, 97 U. S. 501. And so in the *Bement Case*, the court said of this exclusive grant of privilege (p. 90):

"It is true that in certain circumstances the sale of articles manufactured under letters patent may be prevented when the use of such article may be subject, within the several States, to the control which they may respectively impose in the legitimate exercise of their powers over their purely domestic affairs, whether of internal commerce or of police regulation."

In that case the question was not one of infringement, but one arising in a suit to enforce certain contracts directly restraining commerce in patented articles which were claimed to violate the Sherman law, although the agreements covered only patented articles. The court, after referring to the exceptions to the patentee's monopoly resulting from conflict with the police power of the State, said (p. 91):

"Notwithstanding these exceptions, the general rule is absolute freedom in the use or sale of rights under the

patent laws of the United States.   The very object of
these laws is monopoly, and the rule is, with few excep-
tions, that any conditions . which are not in their very
nature illegal with regard to this kind of property, imposed
by the patentee and agreed to by the licensee for the right
to manufacture' or use or sell the article, will be upheld by
the courts.   The fact that the conditions in the contracts
keep up the monopoly or fix prices does not render them
illegal."

Now, if this was a suit to recover damages upon the
contract not to use the machine except in connection with
other articles proper in its use made by the patentee, the
only possible defense would be that the agreement was
one contrary to public policy in that it affected freedom in
the sale of such articles to the user of such machines.   But
that was the nature of the defense made to the suit to
enforce the agreements under consideration in the *Bement
Case.*   The court in that case found that the contracts did
include interstate commerce within their provisions and
restrained interstate trade, but with reference to the
Sherman Act said (p. 92):

"But that statute clearly does not refer to that kind of
a restraint of interstate commerce which may arise from
reasonable and legal conditions imposed upon the assignee
or licensee of a patent by the owner thereof, restricting
the terms upon which the article may be used and the
price to be demanded therefor.   Such a construction of
the act we have no doubt was never contemplated by its
framers."

As to whether the restrictions upon sales imposed by
the agreements were "legal and reasonable conditions,"
the court said (p. 93):

"The provision in regard to the price at which the
licensee would sell the article manufactured under the
license was also an appropriate and reasonable condition.
It tended to keep up the price of the implements manu-

factured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article."

If the stipulation in an agreement between patentees and dealers in patented articles, which, among other things, fixed a price below which the patented articles should not be sold, would be a reasonable and valid condition, it must follow that any other reasonable stipulation, not inherently violative of some substantive law, imposed by a patentee as part of a sale of a patented machine, would be equally valid and enforceable. It must also follow, that if the stipulation be one which qualifies the right of use in a machine sold subject thereto, so that a breach would give rise to a right of action upon the contract, it would be at the same time an act of infringement, giving to the patentee his choice of remedies.

But it has been very earnestly said that a condition restricting the buyer to use it only in connection with ink made by the patentee is one of a character which gives to a patentee the power to extend his monopoly so as to cause it to embrace any subject, not within the patent, which he chooses to require that the invention shall be used in connection with. Of course the argument does not mean that the effect of such a condition is to cause things to become patented which were not so without the requirement. The stencil, the paper and the ink made by the patentee will continue to be unpatented. Anyone will be as free to make, sell and use like articles as they would be without this restriction, save in one particular—namely, they may not be sold to a user of one of the patentee's machines with intent that they

shall be used in violation of the license. To that extent competition in the sale of such articles, for use with the machine, will be affected; for sale to such users for infringing purposes will constitute contributory infringement. But the same consequence results from the sale of any article to one who proposes to associate it with other articles to infringe a patent, when such purpose is known to the seller. But could it be said that the doctrine of contributory infringement operates to extend the monopoly of the patent over subjects not within it because one subjects himself to the penalties of the law when he sells unpatented things for an infringing use? If a patentee says, "I may suppress my patent if I will. I may make and have made devices under my patent, but I will neither sell nor permit anyone to use the patented things," he is within his right, and none can complain. But if he says, "I will sell with the right to use only with other things proper for using with the machines, and I will sell at the actual cost of the machines to me, provided you will agree to use only such articles as are made by me in connection therewith," if he chooses to take his profit in this way, instead of taking it by a higher price for the machines, has he exceeded his exclusive right to make, sell and use his patented machines? The market for the sale of such articles to the users of his machine, which, by such a condition, he takes to himself, was a market which he alone created by the making and selling of a new invention. Had he kept his invention to himself, no ink could have been sold by others for use upon machines embodying that invention. By selling it subject to the restriction he took nothing from others and in no wise restricted their legitimate market.

A like objection has been made against injunctions restraining the sale for infringing purposes of a single element in a patent combination. It was said that to enjoin such sales, although the thing sold was intended

to be used with other elements to complete an infringing combination, was to extend the scope of the patent so as to give to the patentee the same advantage as if the element had been claimed alone. But in *Davis Electrical Co.* v. *Edison Co.*, 60 Fed. Rep. 276, 280, Judge Putnam answered this, saying:

"Neither in such instances, nor in the case at bar, is the course of the law to be turned aside because the practical result may be to give a patentee for the time being more than the patent office contemplated, nor is the patentee to be deprived of his just rights because under some circumstances he gets incidental advantages beyond what he expressly bargained for. We do not in terms give the patentee the benefit of a claim for the filament alone, nor prohibit its use in some other combination than that set out in the second claim, if some ingenious way of making such other combination is ever discovered."

In *Thomson-Houston Co.* v. *Kelsey Co.*, 72 Fed. Rep. 1016, the language was adopted by Judge Townsend.

Neither can we see that the liability of the defendants for aiding and abetting an infringing use by Miss Skou would be different whether she had made her machine in open defiance of the rights of the patentee or had bought it under conditions limiting her right of use. If she had made it, she would have been liable to an action for infringement for making; and if she used it, she would become liable for such infringing use. But if the defendants knew of the patent and that she had unlawfully made the patented article, and then sold her ink or other supplies without which she could not operate the machine, *with the intent and purpose that she should use the infringing article by means of the ink supplied by them,* they would assist in her infringing use.

"Contributory infringement," says Judge Townsend in *Thomson-Houston Co.* v. *Kelsey Co.*, 72 Fed. Rep. 1016,

1017, "has been well defined as the intentional aiding of one person by another in the unlawful making or selling or using of the patented invention." To the same effect are *Wallace* v. *Holmes*, 29 Fed. Cases, 74, 79; *Risdon Iron & Locomotive Works* v. *Trent*, 92 Fed. Rep. 375; *Thomson-Houston Co.* v. *Ohio Brass Works*, 80 Fed. Rep. 712; *American Graphophone Co.* v. *Hawthorne*, 92 Fed. Rep. 516.

In the *Risdon Case*, a member of the firm which made the plans for the construction of certain mining machinery to be made in the owner's shop, and then superintended its erection at the mine, was held to be guilty of infringement, though he neither personally made nor used the machines which were found to be an infringement of valid patents. In *American Graphophone Co.* v. *Hawthorne*, one who sold a machine with knowledge that it was to be used to produce an infringing article was held to be liable as an infringer.

For the purpose of testing the consequence of a ruling which will support the lawfulness of a sale of a patented machine for use only in connection with supplies necessary for its operation bought from the patentee, many fanciful suggestions of conditions which might be imposed by a patentee have been pressed upon us. Thus it is said that a patentee of a coffee pot might sell on condition that it be used only with coffee bought from him, or, if the article be a circular saw, that it might be sold on condition that it be used only in sawing logs procured from him. These and other illustrations are used to indicate that this method of marketing a patented article may be carried to such an extent as to inconvenience the public and involve innocent people in unwitting infringements. But these illustrations all fail of their purpose, because the public is always free to take or refuse the patented article on the terms imposed. If they be too onerous or not in keeping with the benefits, the patented article will not find a market. The public, by permitting the invention to go unused, loses nothing

which it had before, and when the patent expires will be free to use the invention without compensation or restriction. This was pointed out in the *Paper Bag Case*, where the inventor would neither use himself nor allow others to use, and yet was held entitled to restrain infringement, because he had the exclusive right to keep all others from using during the life of the patent. This larger right embraces the lesser of permitting others to use upon such terms as the patentee chooses to prescribe. It must not be forgotten that we are dealing with a constitutional and statutory monopoly. An attack upon the rights under a patent because it secures a monopoly to make, to sell and to use, is an attack upon the whole patent system. We are not at liberty to say that the Constitution has unwisely provided for granting a monopolistic right to inventors, or that Congress has unwisely failed to impose limitations upon the inventor's exclusive right of use. And if it be that the ingenuity of patentees in devising ways in which to reap the benefit of their discoveries requires to be restrained, Congress alone has the power to determine what restraints shall be imposed. As the law now stands it contains none, and the duty which rests upon this and upon every other court is to expound the law as it is written. Arguments based upon suggestions of public policy not recognized in the patent laws are not relevant. The field to which we are invited by such arguments is legislative, not judicial. The decisions of this court, as we have construed them, do not so limit the privilege of the patentee, and we could not so restrict a patent grant without overruling the long line of judicial decisions from Circuit Courts and Circuit Courts of Appeal, heretofore cited, thus inflicting disastrous results upon individuals who have made large investments in reliance upon them.

The conclusion we reach is that there is no difference, in principle, between a sale subject to specific restrictions as to the time, place or purpose of use and restrictions

requiring a use only with other things necessary to the use of the patented article purchased from the patentee. If the violation of the one kind is an infringement, the other is also. That a violation of any such restriction annexed to a sale by one with notice constitutes an infringing use has been decided by a great majority of the Circuit Courts and Circuit Courts of Appeal, and has come to be a well-recognized principle in the patent law, in accordance with which vast transactions in respect to patented articles have been conducted. But it is now said that the numerous decisions by the lower courts have been erroneous in respect to the proper construction of the limit of the monopoly conferred by a patent, and that they should now be overruled. To these courts has been committed the duty of interpreting and administering the patent law. There is no power in this court to review their judgments, except upon a writ of certiorari, or to direct their decisions, save through a certified interrogatory for direction upon a question of law. This power to review by certiorari is one which has been seldom exercised in patent cases. A line of decisions, which has come to be something like a rule of property, under which large businesses have been conducted, should at least not be overruled except upon reasons so clear as to make any other construction of the patent law inadmissible.

The earliest of the reported cases in which the precise question here presented arose were cases arising in suits for the infringement of a patent upon an iron band connected by a buckle, intended for binding cotton bales. The band and this buckle were of iron. The buckle was so adjusted as that the band could be removed from the bale only by cutting. Upon the buckle were stamped the words: "Licensed to use only once." When cut from the bale the band and buckle were sold to persons, who used the buckles either upon a new band, or one repaired, and these bands were sold to planters to be used again in baling

cotton. The question arose in a number of cases as to whether such second use of the buckles by one with notice, was an infringing use. In *American Cotton Tie Co.* v. *Simmons,* 3 Ban. & A. 320, Judge Shepley dismissed the bill. The case, upon appeal to this court, was reversed, upon the ground that that which had been done after the first use was a reconstruction, and not a repair, and was, therefore, an infringement. 106 U. S. 89. The court did not pass upon the question whether a second use of the buckles would be an infringing use. Another case arising under the same patent was that of *American Cotton Tie Supply Co.* v. *Bullard,* 4 Ban. & A. 520, decided by Judge Blatchford, who gave the question great consideration. "It is manifest," says Judge Blatchford, "that the owner of the patents intended, by the stamps upon the buckles and the imprints on the billheads, to grant a restricted license for the use of the ties and the buckles, and that the intended restriction was to a use of them once only, as baling ties. The words, 'licensed to use once only,' stamped on each buckle, were a notice to everyone who handled it that there was attached to it a restriction in the shape of a license, and of a license merely to use, and of a license to use only once. This was a lawful restriction." Concerning the question of the effect of this restriction upon subsequent buyers of the cotton with its bands and buckles, the court said: "It is difficult to see how, in view of the facts of the case, the owners of these patents can properly be said to have sold the buckles for the purpose of allowing them to be used in the ordinary pursuits of life and to pass into the markets of the country as an ordinary article of commerce. . . . The original license is fairly a license to have the buckle and the band confine a bale until the consumer needs to confine the bale no longer, and a license for no longer time. There is no purchase of buckle and band by a purchaser of the baled cotton, except as he purchases them confining the cotton

and to confine it until it reaches the consumer, and such purchase of buckle and band is, in effect, only a purchase of them subject to such original license. It is quite as reasonable to say that the purchaser of the cotton buys subject to such license as it is to say that the licensor, having imposed the restricted license, permits it to be instantly destroyed. The former view is consistent with the original intention, and the latter view is inconsistent with it."

. As indicating the trend of judicial opinion that such license restrictions annexed to patented articles, when sold, constitute licenses under the patent, and that their violation by persons having notice constitutes an infringement of the patent, we here set out in the margin a number of the reported cases.[1]

It would lengthen this opinion unreasonably to make

---

[1] *Dickerson* v. *Matheson*, 57 Fed. Rep. 524, Second Circuit Court of Appeals; *Heaton-Penin. Co.* v. *Eureka Specialty Co.*, 77 Fed. Rep. 288, Sixth Circuit Court of Appeals; *Tubular Rivet Co.* v. *O'Brien*, 93 Fed. Rep. 200; *Cortelyou* v. *Lowe*, 111 Fed. Rep. 1005, Second Circuit Court of Appeals; *Edison Phonograph Co.* v. *Kaufmann*, 105 Fed. Rep. 960; *Edison Phonograph Co.* v. *Pike*, 116 Fed. Rep. 863; *Victor Talking Machine Co.* v. *The Fair*, 123 Fed. Rep. 424, Seventh Circuit Court of Appeals; *National Phonograph Co.* v. *Schlegel*, 128 Fed. Rep. 733; *The Fair* v. *Dover Mfg. Co.*, 166 Fed. Rep. 117; *Æolian Co.* v. *Juelg Co.*, 155 Fed. Rep. 119, Second Circuit Court of Appeals; *A. B. Dick Co.* v. *Milwaukee Co.*, 168 Fed. Rep. 930, Seventh Circuit Court of Appeals; *Crown Cork & Seal Co.* v. *Brooklyn Co.*, 172 Fed. Rep. 225; *Rupp* v. *Elliott*, 131 Fed. Rep. 730, Sixth Circuit Court of Appeals; *Commercial Co.* v. *Autolux Co.*, 181 Fed. Rep. 387; *Boesch* v. *Graff*, 133 U. S. 697, where articles made in Germany under a German patent, and imported to this country, were held to infringe a United States patent for the same article; and *Dickerson* v. *Tinling*, 84 Fed. Rep. 192, where it was held that one purchasing a patented article in Germany from the owners of a United States patent, having marked on it a condition that it should not be imported into the United States, was held guilty of infringement by bringing it into the United States.

See also Curtiss on Patents, §§ 218–218a; Walker on Patents, §§ 300, 301, 302; *Wilson* v. *Sherman*, 1 Blatchf. 536.

quotations from these opinions to show either the grounds upon which they go or their applicability. Some of them concern sales subject to a restriction upon the price upon resale, and others relate to a requirement that the article sold shall be used only in connection with certain other things to be bought from the patentee. We deem it well, however, to refer to the opinion of the Circuit Court of Appeals of the Eighth Circuit, delivered by Judge (now Mr. Justice) Van Devanter in *National Phonograph Co.* v. *Schlegel*, cited above, because it draws so clearly the distinction between a conditional and an unconditional sale of a patented article. Speaking for the court, Judge Van Devanter said (128 Fed. Rep. 733, 735):

"An unconditional or unrestricted sale by the patentee, or by a licensee authorized to make such sale, of an article embodying the patented invention or discovery, passes the article without the limits of the monopoly, and authorizes the buyer to use or sell it without restriction; but to the extent that the sale is subject to any restriction upon the use or future sale the article has not been released from the monopoly, but is within its limits, and, as against all who have notice of the restriction, is subject to the control of whoever retains the monopoly. This results from the fact that the monopoly is a substantial property right conferred by law as an inducement or stimulus to useful invention and discovery, and that it rests with the owner to say what part of this property he will reserve to himself and what part he will transfer to others, and upon what terms he will make the transfer."

There is no collision between the rule against restrictions upon the alienation or use of chattels not made under the protection of a patent and the right of the patentee through his control over his invention. The distinction is pointed out by Mr. Justice Hughes in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, 401.

The English patent law, like our own, grants to the

patentee the exclusive right to make, to sell and to use. The decisions of the English courts upon the subject are, therefore, worthy of examination, and weight should be attached not only because of the respect due by reason of the similarity of statutes, but because many English patentees take out American patents and the converse. The English opinions which we shall refer to have to do with the sale of patented articles with restrictions upon the use.

The cases of *Incandescent Gaslight Co.* v. *Cantelo,* 12 Patent Law Reports, 262, decided in 1895, and *Incandescent Gaslight Co.* v. *Brogden,* 16 Patent Law Reports, 179, decided in 1899, were actions for the infringement of the Welsbach mantle patent for incandescent gas lighting. The mantles were sold subject to a license restriction, printed on the box containing them, that they should be used in connection with burners or apparatus sold or supplied by the patentee. In the *Cantelo Case* Mr. Justice Wills said (p. 264):

"The sale of a patented article carries with it the right to use it in any way that the purchaser chooses to use it, unless he knows of restrictions. Of course, if he knows of restrictions, and they are brought to his mind at the time of the sale, he is bound by them. He is bound by them on this principle: The Patentee has the sole right of using and selling the articles, and he may prevent anybody from dealing with them at all. Inasmuch as he has the right to prevent people from using them, or dealing in them at all, he has the right to do the lesser thing, that is to say, to impose his own conditions. It does not matter how unreasonable or how absurd the conditions are. It does not matter what they are if he says at the time when the purchaser proposes to buy, or the person to take a license, 'Mind, I only give you this license on this condition,' and the purchaser is free to take it or leave it as he likes. If he takes it, he must be bound by the condition. It seems

to be common sense, and not to depend upon any patent law, or any other particular law."

Upon the evidence it was held that Cantelo not having bought direct, he did not have actual knowledge of the restriction, and he was given judgment for costs upon that defense.

In the subsequent case against Brogden, the complainants were given an injunction against future infringement, and an accounting for damages for past infringement, upon the second point in the claim, namely, that the defendant had sold, being a dealer, with notice of the restriction, for use upon a burner not made or supplied by the patentee. As to the effect of the sale subject to the license restriction as to the use, Lord Justice Kennedy said: "A patentee has a right, not merely by sale without reserve, to give an unlimited right to the purchaser to use, and thereby to make a grant from which he cannot derogate, but may attach to it conditions, and if these conditions are broken then there is no license, because the licensee is bound up with the observance of the conditions."

In *British Mutoscope and Biograph Company* v. *Homer,* 17 Times Law Reports, 213, decided in 1901, it was held that the purchaser of a mutoscope under a rent distress warrant obtained no greater right to the use of the patented machine than that which pertained to the execution debtor, and that if the debtor had no right other than a strictly personal right to use, the purchaser obtained no right to the use. Mr. Justice Farwell, who delivered the opinion, cited and quoted with approval from the case of the *Incandescent Gaslight Co.* v. *Brogden,* 16 Patent Law Reports, 179, where it was said that a purchaser who buys with knowledge of the conditions under which his vendor is authorized to use a patented invention is bound by such conditions, and that such conditions are not contractual, but are incident to and a

limitation of the grant of the licensee to use, so that if the conditions are broken there is no grant at all.

In *McGruther* v. *Pitcher*, 20 Times Law Reports, 652, it is held that the purchaser of an article made under a patent and sold originally subject to restrictions as to place or method of use is not bound by such restrictions unless he buys with notice of them, as such restrictions do not run with the goods and are obligatory only upon those persons who take the article with knowledge of the conditions.

In the very late case of the *National Phonograph Co.* v. *Menck*, decided in 1911 by the Judicial Committee of the Privy Council, and reported in 27 Times Law Reports, 239, the cases were cited and reviewed. Referring to the distinction between the principles applicable to sales of unpatented and patented articles, Lord Shaw, in delivering the opinion of the court said (p. 241): "To begin with, the general principle . . . applicable to ordinary goods bought and sold, is not here in question. The owner may use and dispose of these as he sees fit. He may have made a certain contract with the person from whom he bought, and to such a contract he must answer. Simply, however, in his capacity as owner, he is not bound by any restrictions in regard to the use or sale of the goods, and it is out of the question to suggest that restrictive conditions run with the goods. . . ." Referring to former cases, he proceeds: "All that is affirmed is that the general doctrine of absolute freedom of disposal of chattels of an ordinary kind is, in the case of patented chattels, subject to the restriction that the person purchasing them, and in the knowledge of the conditions attached by the patentee, which knowledge is clearly brought home to himself at the time of sale, shall be bound by that knowledge and accept the situation of ownership subject to the limitations. These limitations are merely the respect paid and the effect given to those conditions of transfer of the

patented article which the law, laid down by statute, gave
the original patentee a power to impose. Whether the
law on this head should be changed and the power of sale
*sub modo* should be withdrawn or limited is not a question
for a court. It may be added that where a patented
article has been acquired by sale, much, if not all, may be
implied as to the consent of the licensee to an undisturbed
and unrestricted use thereof. In short, such a sale nega-
tives in the ordinary case the imposition of conditions and
the bringing home to the knowledge of the owner of the
patented goods that restrictions are laid upon him."
Lord Shaw then referred to the case of the *Incandescent
Light Co.* v. *Cantelo,* cited above, saying that, "The judg-
ment in that case by Mr. Justice Wills forms undoubtedly
a leading authority in the law of England." The passage
above set out is then quoted in full.

The precise question here involved has never been de-
cided by this court. It was raised in the *Cotton Tie Case,*
106 U. S. 89, but was passed by and the case decided upon
the single ground that the defendants had infringed by a
reconstruction of the bands after they had been cut. It
was again presented in *Cortelyou* v. *Johnson,* 207 U. S.
196, 199, but was not decided, because it did not appear
that the defendants, charged as contributory infringers
as in the present case, had notice of the restriction upon
the use of the patented machine.

In *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339, 345, it
was urged that the analogy between the right of one under
the copyright statute to fix the price at which a copy-
righted book might be sold by retailers by a mere notice
accompanying the book, and the right of one selling a
patented article subject to a condition that it should not
be sold at less than a prescribed minimum price, was
such as to entitle the owner of the copyright to treat a
sale contrary to the notice as an infringing sale. But this
court declined to consider the rule applicable to restrictive

licenses accompanying the sale of a patented article, say-
ing: "If we were to follow the course taken in the argument,
and discuss the rights of a patentee, under letters patent,
and then, by analogy, apply the conclusions to copyrights,
we might greatly embarrass the consideration of a case
under letters patent, when one of that character shall be
presented to this court.

"We may say in passing, disclaiming any intention to
indicate our views as to what would be the rights of parties
in circumstances similar to the present case under the
patent laws, that there are differences between the patent
and copyright statutes in the extent of the protection
granted by them.  This was recognized by Judge Lurton,
who wrote a leading case on the subject in the Federal
courts (*The Button Fastener Case*, 77 Fed. Rep. 288); for
he said in the subsequent case of *Park & Sons* v. *Hartman*,
153 Fed. Rep. 24:

" 'There are such wide differences between the right of
multiplying and vending copies of a production protected
by the copyright statute and the rights secured to an in-
ventor under the patent statutes, that the cases which
relate to the one subject are not altogether controlling as
to the other.' "

Touching the question there involved, the court said
(p. 350):

"The precise question, therefore, in this case is, does
the sole right to vend (named in § 4952) secure to the
owner of the copyright the right, after the sale of the book
to a purchaser, to restrict future sales of the book at retail,
to the right to sell it at a certain price per copy, because
of a notice in the book that a sale at a different price will
be treated as an infringement, which notice has been
brought home to one undertaking to sell for less than the
named sum?  We do not think the statute can be given
such a construction, and it is to be remembered that this
is purely a question of statutory construction.  There is

no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book.

"In our view the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice, such as is disclosed in this case, a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract. This conclusion is reached in view of the language of the statute, read in the light of its main purpose to secure the right of multiplying copies of the work, a right which is the special creation of the statute. True, the statute also secures, to make this right of multiplication effectual, the sole right to vend copies of the book, the production of the author's thought and conception. The owner of the copyright in this case did sell copies of the book in quantities and at a price satisfactory to it. It has exercised the right to vend. What the complainant contends for embraces not only the right to sell the copies, but to qualify the title of a future purchaser by the reservation of the right to have the remedies of the statute against an infringer because of the printed notice of its purpose so to do unless the purchaser sells at a price fixed in the notice. To add to the right of exclusive sale the authority to control all future retail sales, by a notice that such sales must be made at a fixed sum, would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment."

Though the Constitution gives to Congress power to promote "Science and Useful Arts," by securing for a limited time to writers and inventors "the exclusive right to their respective writings and discoveries," the legislation for this purpose had to be adapted to the difference between a "discovery" and a "writing." To secure to

the author an exclusive right to his "writings" Congress
provided that he should have "the sole liberty of printing,
reprinting, publishing, completing, copying, executing,
finishing and vending the same." Revised Statutes,
§ 4952. This is, in short, the sole right to multiply and
vend copies of his production. While there are resem-
blances between the right of the author to "vend" his
copyrighted production, and of the patentee to "vend"
the patented thing, the inherent difference between the
production of an author, be it a book, music or a picture,
and that of an inventor, be it a machine, a process or an
article, is so manifest that the exclusive right of one to
multiply and sell was declared sufficient to give him that
exclusive right to his writings proposed by the Constitu-
tion. To the inventor, by § 4884, Revised Statutes, there
is granted "the exclusive right to make, *use* and vend the
invention or discovery." This grant, as defined in *Bloomer*
v. *McQuewan*, 14 How. 539, 549, "consists altogether in
the right to exclude every one from making, *using* or vend-
ing the thing patented." Thus, there are several sub-
stantive rights, and each is the subject of subdivision, so
that one person may be permitted to make, but neither
to sell nor use the patented thing. To another may be
conveyed the right to sell, but within a limited area, or for
a particular use, while to another the patentee may grant
only the right to make and use, or to use only for specific
purposes. *Adams* v. *Burks*, 17 Wall. 453; *Mitchell* v.
*Hawley*, 16 Wall. 544; *Rubber Co.* v. *Goodyear*, 9 Wall. 788,
799. Thus, in the case last cited the license was "to use
the said Goodyear's gum-elastic composition for coating
cloth for the purpose of japanning, marbling, and variegate
japanning, at his own establishment, but not to be dis-
posed of to others for that purpose without the consent
of the said Charles Goodyear, . . . the right and li-
cense hereby conferred being limited to the United States,
and not extending to any foreign country, and not being

intended to convey any right to make any contract with the government of the United States." Of this license, this court said (p. 799):

"It authorizes Chaffee to use it himself. It gave him no right to authorize others to use it in conjunction with himself, or otherwise, without the consent of Goodyear, which is not shown, and not to be presumed. It was to be used at his own establishment, and not at one occupied by himself and others. Looking at the terms of the instrument, and the testimony in the record, we are satisfied that its true meaning and purpose were to authorize the licensee to make and sell India-rubber cloth, to be used in the place, and for the purposes, of patent or japanned leather. In our judgment it conveyed authority to this extent and nothing more."

The licensees were held to have infringed the license by uses not permitted.

We have already pointed out that in the *Bement Case*, 186 U. S. 91, it was said in respect of the power of a patentee that, in the sale of rights under a patent, "with few exceptions any conditions which are not in their nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee, for the right to manufacture, *or use, or sell the article* will be upheld by the courts." (Italics ours.) The question, as was said in reference to the copyright, is one of statutory construction. The kinds of property rights sought to be guaranteed and the terms of the two statutes are so different that very different constructions have been placed upon them. There is no collision whatever between the decision in the *Bobbs-Merrill Case* and the present opinion. Each rests upon a construction of the applicable statute, and the special facts of the cases.

The *Paper Roll Case* (*Morgan Envelope Co.* v. *Albany Paper Co.*), 152 U. S. 425, has been relied upon by the defendants. We do not question that case, nor anything it

decides. But it has no application to the question here presented. This is manifest when that case is attentively examined. First, because here the ink and other supplies used in the operation of the complainant's rotary mimeograph patent were not made elements of the patent, as in the *Paper Roll Case;* and second, the toilet paper fixture in the *Paper Roll Case* was not sold with the license restriction that it was not to be used except in connection with paper supplied by the patentee. There was some evidence of a practice to sell the fixture only to those who used the patentee's paper; but this was far from proof of a specific license annexed to the sale of the fixtures that they were sold only to be used with paper supplied by the patentee. One who bought subject to no such restriction acquired the right to use the fixture with any paper. The opinion in that case is considered and analyzed in all of its aspects in the *Button Fastener Case,* 77 Fed. Rep. 288, 298–9.

We come then to the question as to whether "the acts of the defendants constitute contributory infringement of the complainants' patent."

The facts upon which our answer must be made are somewhat meagre. It has been urged that we should make a negative reply to the interrogatory as certified, because the intent to have the ink sold to the licensee used in an infringing way is not sufficiently made out. Undoubtedly a bare supposition that by a sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer. Such a rule would block the wheels of commerce. There must be an intent and purpose that the article sold will be so used. Such a presumption arises when the article so sold is only adapted to an infringing use. *Rupp & Wittgenfeld Co.* v. *Elliott,* 131 Fed. Rep. 730. It may also be inferred where its most conspicuous use is one which will coöperate in an infringement when sale to such user is invoked by advertise-

ment. *Kalem Co.* v. *Harper Brothers,* decided at this term, 222 U. S. 55.

These defendants are, in the facts certified, stated to have made a direct sale to the user of the patented article, with knowledge that under the license from the patentee she could not use the ink, sold by them directly to her, in connection with the licensed machine, without infringement of the monopoly of the patent. It is not open to them to say that it might be used in a non-infringing way, for the certified fact is that they made the sale, "with the expectation that it would be used in connection with said mimeograph." The fair interpretation of the facts stated is that the sale was with the purpose and intent that it would be so used.

So understanding the import of the question in connection with the facts certified, *we must answer the question certified affirmatively.*

MR. JUSTICE DAY did not hear the argument and took no part in the decision of this case.

MR. CHIEF JUSTICE WHITE, with whom concurred MR. JUSTICE HUGHES and MR. JUSTICE LAMAR, dissenting.

My reluctance to dissent is overcome in this case: First, because the ruling now made has a much wider scope than the mere interest of the parties to this record, since, in my opinion, the effect of that ruling is to destroy, in a very large measure, the judicial authority of the States by unwarrantedly extending the Federal judicial power. Second, because the result just stated, by the inevitable development of the principle announced, may not be confined to sporadic or isolated cases, but will be as broad as society itself, affecting a multitude of people and capable of operation upon every conceivable subject of human contract, interest or activity, however

intensely local and exclusively within state authority
they otherwise might be.   Third, because the gravity
of the consequences which would ordinarily arise from
such a result is greatly aggravated by the ruling now
made, since that ruling not only vastly extends the
Federal judicial power, as above stated, but as to all the
innumerable subjects to which the ruling may be made
to apply, makes it the duty of the courts of the United
States to test the rights and obligations of the parties,
not by the general law of the land, in accord with the
conformity act, but by the provisions of the patent law,
even although the subjects considered may not be within
the embrace of that law, thus disregarding the state law,
overthrowing, it may be, the settled public policy of the
State, and injuriously affecting a multitude of persons.
Lastly, I am led to express the reasons which constrain
me to dissent, because of the hope that if my forebodings
as to the evil consequences to result from the applica-
tion of the construction now given to the patent statute
be well founded, the statement of my reasons may serve
a twofold purpose: First, to suggest that the application
in future cases of the construction now given be confined
within the narrowest limits, and, second, to serve to
make it clear that if evils arise their continuance will not
be caused by the interpretation now given to the statute,
but will result from the inaction of the legislative de-
partment in failing to amend the statute so as to avoid
such evils.

Let me briefly recapitulate the facts and the rulings
based thereon.   A machine styled a rotary mimeograph
was covered by a patent.   The claims of the patent,
however, did not embrace the ink or other materials
used in working the machine, nor were they covered by
independent patents.   The Dick Company, owner of
the patent, sold one of the machines to a Miss Skou.
The entire title was parted with; in other words, there

was no condition imposed affecting the title or the uses to which the machine might be applied or the duration of the use. Upon the machine, however, was inscribed a notice, styled a License Restriction, reciting that the machine "may be used only with the stencil paper, ink and other supplies made by the A. B. Dick Company, Chicago, U. S. A." The Henry Company, dealers in ink, sold to Miss Skou, for use in working her machine, ink not made by the Dick Company. The court now decides that a use of such ink by Miss Skou would have been "a use of the machine in a prohibited way," and would have rendered her "liable to an action under the patent law for infringement," and that the seller of the ink was liable as an infringer of the patent on the machine because of the aiding and abetting of a proposed infringing use.

I cannot bring my mind to assent to the conclusion referred to, and shall state in the light of reason and authority why I cannot do so. As I have said, the ink was not covered by the patent; indeed, it is stated in argument and not denied that a prior patent which covered the ink had expired before the sale in question. It, therefore, results that a claim for the ink could not have been lawfully embraced in the patent, and if it had been by inadvertence allowed such claim would not have been enforcible. This curious anomaly then results, that that which was not embraced by the patent, which could not have been embraced therein and which if mistakenly allowed and included in an express claim would have been inefficacious, is now by the effect of a contract held to be embraced by the patent and covered by the patent law. This inevitably causes the contentions now upheld to come to this, that a patentee in selling the machine covered by his patent has power by contract to extend the patent so as to cause it to embrace things which it does not include; in other words, to exercise legislative power

of a far-reaching and dangerous character. Looking at it from another point of view and testing the contention by a consideration of the rights protected by the patent law and the rights which an inventor who 'obtains a patent takes under that law, the proposition reduces itself to the same conclusion. The natural right of any one to make, vend and use his invention which but for the patent law might be invaded by others, is by that law made exclusive, and hence the power is conferred to exclude others from making, using or vending the patented invention. *Paper Bag Patent Case,* 210 U. S. 405, 424–425, and cases cited.

The exclusive right of use of the invention embodied in the machine which the patent protected was a right to use it anywhere and everywhere for all and every purpose of which the machine as embraced by the patent was susceptible. The patent was solely upon the mechanism which when operated was capable of producing certain results. A patent for this mechanism was not concerned in any way with the materials to be used in operating the machine, and certainly the right protected by the patent was not a right to use the mechanism with any particular ink or other operative materials. Of course as the owner of the machine possessed the ordinary right of an owner of property to use such materials as he pleased in operating his patented machine and had the power in selling his machine to impose such conditions in the nature of covenants not contrary to public policy as he saw fit, I shall assume that he had the power to exact that the purchaser should use only a particular character of materials. But as the right to employ any desired operative materials in using the patented machine was not a right derived from or protected by the patent law, but was a mere right arising from the ownership of property, it cannot be said that the restriction concerning the use of the materials was a restriction upon the use of the machine protected

by the patent law. When I say it cannot be said I mean that it cannot be so done in reason, since the inevitable result of so doing would be to declare that the patent protected a use which it did not embrace. And this after all serves to demonstrate that it is a misconception to qualify the restriction as one on the use of the machine, when in truth both in form and substance it was but a restriction upon the use of materials capable of being employed in operating the machine. In other words, every use which the patent protected was transferred to Miss Skou, and the very existence of the particular restriction under consideration presupposes such right of complete enjoyment, and because of its possession there was engrafted a contract restriction, not upon the use of the machine, but upon the materials. And these considerations are equally applicable to the exercise of the exclusive right to vend protected by the patent unless it can be said that by the act of selling a patented machine and disposing of all the use of which it is capable a patentee is endowed with the power to amplify his patent by causing it to cover in the future things which at the time of the sale it did not embrace.

But the result of this analysis serves at once again to establish, from another point of view, that the ruling now made in effect is that the patentee has the power, by contract, to extend his patent rights so as to bring within the claims of his patent things which are not embraced therein, thus virtually legislating by causing the patent laws to cover subjects to which without the exercise of the right of contract they could not reach, the result being not only to multiply monopolies at the will of an interested party, but also to destroy the jurisdiction of the state courts over subjects which from the beginning have been within their authority.

The vast extent to which the results just stated may be carried will be at once apparent by considering the facts

of this case and bearing in mind that this is not the suit
of a patentee against one with whom he has contracted
to enforce as against such person an act done in violation
of a contract as an infringement, but it is against a third
person who happened to deal in an ordinary commodity
of general use with a person with whom the patentee had
contracted.   And this statement shows that the effect of
the ruling is to make the virtual legislative authority of the
owner of a patented machine extend to every human being
in society without reference to their privity to any contract
existing between the patentee and the one to whom he
has sold the patented machine.   It is worthy of observa-
tion that the vast power which the ruling confers upon
the holders of patented inventions does not alone cause
controversies which otherwise would be subject to the
state jurisdiction to become matters of exclusive Federal
cognizance, but subjects the rights of the parties when in
the Federal forum to the patent law to the exclusion of the
state law which otherwise would apply and it may be to
the overthrow of the settled public policy of the State
wherein the dealings involved take place.   All these
results are in a measure comprehensively portrayed by the
decree of the Circuit Court.   They are, moreover, vividly
shown by a reference made by the court to and the putting
aside as inapplicable of a previous decision of this court
(*Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373),
which if here applied would cause the alleged license to be
held void as against public policy.   As the theory upon
which the *Miles Medical Co. Case* is treated as inappli-
cable is that this case is one governed by the patent laws
and therefore not within the rule of public policy which
the *Miles Case* applied, it is made indubitably clear that
the ruling now announced endows the patentee with a
right by contract not only to produce the fundamental
change as to jurisdiction of the state and Federal courts
to which I have referred, but also to bring about the over-

throw of the public policy both of the State and Nation, which I at the outset indicated was a consequence of the ruling now made.

I do not think it necessary to stop to point out the innumerable subjects which will be susceptible of being removed from the operation of state judicial power and the fundamental and radical character of the change which must come as a result of the principle decided. But nevertheless let me give a few illustrations:

. Take a patentee selling a patented engine. He will now have the right by contract to bring under the patent laws all contracts for coal or electrical energy used to afford power to work the machine or even the lubricants employed in its operation. Take a patented carpenter's plane. The power now exists in the patentee by contract to validly confine a carpenter purchasing one of the planes to the use of lumber sawed from trees grown on the land of a particular person or sawed by a particular mill. Take a patented cooking utensil. The power is now recognized in the patentee to bind by contract one who buys the utensil to use in connection with it no other food supply but that sold or made by the patentee. Take the invention of a patented window frame. It is now the law that the seller of the frame may stipulate that no other material shall be used in a house in which the window frames are placed except such as may be bought from the patentee and seller of the frame. Take an illustration which goes home to every one—a patented sewing-machine. It is now established that by putting on the machine, in addition to the notice of patent required by law, a notice called a license restriction, the right is acquired, as against the whole world, to control the purchase by users of the machine of thread, needles and oil lubricants or other materials convenient or necessary for operation of the machine. The illustrations might be multiplied indefinitely. That they are not imaginary is now a matter of common

knowledge, for, as the result of a case decided some years ago by one of the Circuit Courts of Appeal, which has been followed by cases in other Circuit Courts of Appeal, to which reference will hereafter be made, what prior to the first of those decisions on a sale of a patented article was designated a condition of sale, governed by the general principles of law, has come in practice to be denominated a license restriction, thus, by the change of form, under the doctrine announced in the cases referred to, bringing the matters covered by the restriction within the exclusive sway of the patent law.  As the transformation has come about in practice since the decisions in question, the conclusion is that it is attributable as an effect caused by the doctrine of those cases.  And, as I have previously stated, it is a matter of common knowledge that the change has been frequently resorted to for the purpose of bringing numerous articles of common use within the monopoly of a patent when otherwise they would not have been embraced therein, thereby tending to subject the whole of society to a widespread and irksome monopolistic control.

But I need not reason further, since, in my opinion, many adjudications of this court directly refute the existence of a supposed right of extension by contract of the patent laws, and are therefore, as I understand them, in conflict with the ruling now made.   In *Wilson* v. *Sandford* (1850), 10 How. 99, the facts were these: Wilson granted to Sandford and the other defendants the right to use a patented planing machine, the consideration to be paid in instalments.   Each note contained a provision that the title should revert in case of non-payment. Upon the theory that the refusal to pay an instalment forfeited the rights of the licensees, Wilson sued to restrain the further use of the machine on the ground that such use was an infringement of his patent rights.   It was, however, decided that the matter in controversy arose

upon contract, and that the requisite jurisdictional value was not involved.   The claim that jurisdiction could be exercised because the case arose under the patent laws, was thus disposed of (p. 101):

"Now the dispute in this case does not arise under any act of Congress; nor does the decision depend upon the construction of any law in relation to patents.   It arises out of the contract stated in the bill; and there is no act of Congress providing for or regulating contracts of this kind.   The rights of the parties depend altogether upon common law and equity principles.   The object of the bill is to have this contract set aside and declared to be forfeited; and the prayer is, 'that the appellant's reinvestiture of title to the license granted to the appellees, by reason of the forfeiture of the contract, may be sanctioned by the court,' and for an injunction.   But the injunction he asks for is to be the consequence of the decree of the court sanctioning the forfeiture.   He alleges no ground for an injunction unless the contract is set aside. And if the case made in the bill was a fit one for relief in equity, it is very clear that whether the contract ought to be declared forfeited or not, in a court of chancery, depended altogether upon the rules and principles of equity, and in no degree whatever upon any act of congress concerning patent rights.   And whenever a contract is made in relation to them, which is not provided for and regulated by congress, the parties, if any dispute arises, stand upon the same ground with other litigants as to the right of appeal; and the decree of the circuit court cannot be revised here, unless the matter in dispute exceeds two thousand dollars."

The foregoing views were reiterated in *Bloomer* v. *McQuewan* (1852), 14 How. 539.

In *Hartshorn* v. *Day* (1856), 19 How. 211, the court, in commenting upon the effect upon a license, of the nonperformance, by the licensee of a patent right, of cove-

nants made by him, and speaking in particular of a covenant to pay an annuity to one Chaffee, the patentee, said (p. 222):

"The payment of the annuity was not a condition to the vesting of the interest in the patent in Judson, and of course . . . the omission or refusal to pay did not give to Chaffee a right to rescind the contract, nor have the effect to remit him to his interest as patentee. The right to the annuity rested in covenant. . . . The remedy for the breach could rest only upon the personal obligation " of the covenantor.

The cases just referred to and others in accord with them were reviewed in the opinion in *Albright* v. *Teas*, 106 U. S. 613, decided in 1883. The case was this: A patentee sold and assigned all his title and interest in the invention covered by his patents, and the purchasers covenanted to use their best efforts to introduce the invention, to pay specified royalties for the use of the patented improvements, etc. The assignor sued in a state court for a discovery and account and a decree for the amount of royalties found due and for general relief. On the application of the defendants the cause was removed into a Circuit Court, upon the theory that the suit was one arising under the patent laws of the United States, and, in consequence, exclusively within the cognizance of the courts of the United States. On final hearing, however, the Circuit Court remanded the cause as being one for the settlement of controversies under a contract, of which the state court had full cognizance. This court held that as the transfer of title was absolute, no rights secured by the patent under any act of Congress remained in the patentee, and that the case arose solely upon the contract and not upon the patent laws of the United States.

The prior cases on the subject were again reviewed by Mr. Justice Gray in *Dale Tile Mfg. Co.* v. *Hyatt* (1888), 125 U. S. 46. The plaintiff sued in a state court to re-

cover from one, who had been licensed by a patentee to make and use certain patented articles, to recover royalties due under the contract. The defendant contended in the state court that the subject-matter was one exclusively cognizable in the courts of the United States because the case was one arising under the patent laws, citing Rev. Stat., § 629, cl. 9; § 711, cl. 5. The contention was held untenable, and in the course of the opinion the court said (p. 52):

"It has been decided that a bill in equity in the Circuit Court of the United States by the owner of letters patent, to enforce a contract for the use of the patent right, or to set aside such a contract because the defendant has not complied with its terms, is not within the acts of Congress, by which an appeal to this court is allowable in cases arising under the patent laws, without regard to the value of the matter in controversy. Act of July 4, 1836, c. 357, § 17, 5 Stat. 124; Rev. Stat., § 699; *Wilson* v. *Sandford,* 10 How. 99; *Brown* v. *Shannon,* 20 How. 55."

Reviewing the decisions in *Hartell* v. *Tilghman,* 99 U. S. 547, and *Albright* v. *Teas, supra,* the court said (p. 53):

"It was said by Chief Justice Taney in *Wilson* v. *Sandford,* and repeated by the court in *Hartell* v. *Tilghman,* and in *Albright* v. *Teas,* 'The dispute in this case does not arise under any act of Congress; nor does the decision depend upon the construction of any law in relation to patents. It arises out of the contract stated in the bill; and there is no act of Congress providing for or regulating contracts of this kind. The rights of the parties depend altogether upon common law and equity principles.' 10 How. 101, 102; 99 U. S. 552; 106 U. S. 619.

"Those words are equally applicable to the present case, except that, as it is an action at law, the principles of equity have no bearing. This action, therefore, was within the jurisdiction, and, the parties being citizens of the same State, within the exclusive jurisdiction, of the

State courts; and the only federal question in the case was rightly decided."

The case of *Keeler* v. *Standard Folding Bed Co.*, 157 U. S. 659, touches upon the precise question before us. In the course of the opinion, the court said—italics mine— (p. 666):

"Upon the doctrine of these cases we think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. *It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws.*"

A reference to the foregoing and other decided cases is contained in the opinion in *Excelsior Wooden Pipe Co.* v. *Pacific Bridge Co.*, 185 U. S. 282. The suit was by a licensee authorized to manufacture and sell wooden pipe under certain letters patent, against two defendants, one of whom was the licensor and owner of the patent. The covenants of the licensee were, (1) to pay a license fee or royalty; (2) not to transfer or assign the license without the consent of the patentee; and (3) that the license might be revoked for failure to manufacture. While, because of peculiar conditions present in the case, the suit was held to be one arising under the patent laws, the court yet observed (p. 290):

"Now, it may be freely conceded that, if the *licensee* had failed to observe any one of the three conditions of the license, the *licensor* would have been obliged to resort to the state courts either to recover the royalties, or to procure a revocation of the license. Such suit would not involve any question under the patent law."

The court, after reciting the facts in the case of *Pratt* v.

*Paris Gaslight & Coke Co.*, 168 U. S. 255, said (pp. 286, 287):

"It was held that the action was not one arising under the patent laws of the United States, and that to constitute such a cause the plaintiff must set up some right, title or interest under the patent laws, or at least make it appear that some right or privilege will be defeated by one construction or sustained by the opposite construction of those laws. That 'section 711 does not deprive the state courts of the power to. determine *questions* arising under the patent laws, but only of assuming jurisdiction of *cases* arising under those laws. There is a complete distinction between a case and a question arising under the patent laws. The former arises when the plaintiff in his opening pleading—be it a bill, complaint or declaration—sets up a right under the patent laws as ground for a recovery. Of such the state courts have no jurisdiction. The latter may appear in the plea or answer or in the testimony. The determination of such question is not beyond the competency of the state tribunals.' "

The case of *Bement* v. *National Harrow Co.*, decided at the same term as the *Wooden Pipe Case*, illustrates the doctrine. In that case the National Harrow Company, the patentee, commenced the action in a state court of New York to recover damages for the violation of license contracts pertaining to the manufacture and sale of a patent harrow and also sought to restrain the future violation of the contracts and compel their specific performance. If in consequence of the subject-matter the case was one arising under the patent laws, as it would have. been if the question of infringement of the patent was involved, the jurisdiction of the courts of the United States was exclusive. The case was disposed of on its merits in the state courts and came to this court by writ of error upon the question as to whether the agreements between the licensor and licensee violated

the Federal anti-trust law, and jurisdiction was entertained and the Federal question was passed upon.

Finally, it seems to me the rulings made in the *Morgan Envelope Case,* 152 U. S. 425, are so apposite here as practically in reason to foreclose all controversy on the question.   In that case suit was brought on three patents, one for an oval roll of paper, the other two for apparatus for holding the paper.   The patentee sold the fixtures or apparatus only to purchasers of his paper, with the understanding that the paper would be subsequently purchased of the plaintiff company.   It was held that the patent for the roll of paper was invalid, but the validity of the apparatus claims, or at least of some of them, was not challenged.   The defendant sold the paper with full knowledge of the restriction imposed by the patentee. Mr. Justice Brown, after quoting from *Chaffee* v. *Boston Belting Co.,* 22 How. 217, 223, says (pp. 432, 433):

" The real question in this case is, whether, conceding the combination of the oval roll with the fixture to be a valid combination, the sale of one element of such combination, with the intent that it shall be used with the other element, is an infringement.   We are of opinion that it is not.   .   .   .   Of course, if the product itself is the subject of a valid patent, it would be an infringement of that patent to purchase such product of another than the patentee; but if the product be unpatentable, it is giving to the patentee of the machine the benefit of a patent upon the product, by requiring such product to be bought of him."

Earlier in the opinion it was said (p. 431):

"The first defense raises the question whether, when a machine is designed to manufacture, distribute, or serve out to users a certain article, the article so dealt with can be said to be a part of the combination of which the machine itself is another part.   If this be so, then it would seem to follow that the log which is sawn in the

mill; the wheat which is ground by the rollers; the pin which is produced by the patented machine; the paper which is folded and delivered by the printing press, may be claimed as an element of a combination of which the mechanism doing the work is another element.   The motion of the hand necessary to turn the roll and withdraw the paper is analogous to the motive power which operates the machinery in the other instances."

Nor when accurately appreciated is there any conflict between the principles so long and firmly established by the cases to which I have just referred and the doctrine upheld in the *Goodyear Rubber Case*, 9 Wall. 788, and *Mitchell v. Hawley*, 16 Wall. 544.   In the *Goodyear Case* the facts were these: The right was conferred upon one Chaffee by license "to use the said Goodyear's gum elastic composition for coating cloth for the purpose of japanning, marbling, and variegate japanning, at his own establishment, but not to be disposed of to others for that purpose without the consent of the said Charles Goodyear; . . . the right and license hereby conferred being limited to the United States, and not extending to any foreign country, and not being intended to convey any right to make any contract with the Government of the United States."   Looking at the terms of the license and the testimony in the record, the court considered the instrument only "to authorize the licensee to make and sell India rubber cloth, to be used in the place, and for the purpose, of patent or japanned leather."   The patent was held to be infringed because a right of use of the invention not granted to the licensee but reserved by the patentee or his assignee to himself, viz.: "the exclusive right to manufacture and sell army and navy equipments made of vulcanized India rubber," etc., had been invaded by the defendants.

In *Mitchell* v. *Hawley* this was the controversy: A patentee of certain machines, whose original patent had

still between six and seven years to run, conveyed to another person the "right to make and use and to license to others the right to make and use four of the machines" in two States "during the remainder of the original term of the letters-patent, *provided*, that the said grantee shall not in any way or form dispose of, sell, or grant any license to use the said machines *beyond* the said term." The licensee constructed and sold four machines to persons who, as found by the court, had knowledge of the limited title of the licensee. After the patent had expired, and during an extended term of the patent, the persons to whom the licensee had transferred the machines made use of the machines in violation of the limitation, and the owner of the patent sued to prevent the infringement, and his right to do so was upheld. Stating it to be unquestioned that a patentee who had absolutely parted with the title to the machine and with the use which the patent protected must be understood to have parted with all his exclusive right, and hence ceased to have any interest in the machine protected by the patent law, the court maintained the contentions of the complainant, on the ground that the rule just stated did not apply where the patentee did not grant the entire right covered by the patent, but retained a part thereof in himself, and therefore a violation of such reserved right was in conflict with a right still protected by the patent and an infringement of the patent. The difference between the rule applied in that case and the doctrine of the many other cases which we have cited and which also exists between the controversy presented in *Mitchell* v. *Hawley* and the one here under consideration was simply as follows: (*a*) That which exists between the conveyance of all one's rights covered by a patent and a transfer of only a part of such rights; (*b*) that which obtains between the ability of a patentee to protect the right which he enjoys under the patent law from infringement and his

want of power on parting with all his rights under the patent to contract so as to secure rights never embraced in his patent, and to bring such newly acquired contract rights under the protection of the patent law. That the sale here in question was one of all the rights which the patent protected has, it seems to me, at the outset been demonstrated beyond reasonable dispute. I mean, of course, within the limit of my powers of understanding, since, looking at the so-called license restriction again and again with a purpose if possible to bring my mind to assent to the view which the court takes of it, I find it impossible to do so. And in this connection it is to be observed that the real nature of the transaction is, in the argument of counsel for the Dick Company, stated to be directly the opposite of that which the court now holds it to be. Thus, counsel say:

"In the license plan in issue, the licensor, by limiting the market at which supplies may be purchased, is merely insuring to himself a royalty based upon the output of the machine. The licensor, by requiring the purchase of ink of him, in fact exacting a royalty (infinitesimal in amount) for every copy of the original produced by the mimeograph. The very nature of the work of these machines forbids the use of a fixed money royalty upon the work produced, since the money value is so small that the expense of the accounting would be prohibitive of such a method."

A construction of the restriction which, by speaking of license and licensor, obscures the fact that the restriction itself states the transaction to have been a sale of the machine and its right of use, yet by the very force of the nature of the so-called restriction describes it as being in essence and effect but a consideration for the rights parted with, and thus brings the case within the doctrine of *Wilson* v. *Sandford, Albright* v. *Teas,* and other cases which I have referred to.

The distinction between the two rules and the absolute harmony and coöperation between them had been pointed out before the decision in *Mitchell* v. *Hawley*, and has been since so clearly indicated as to my mind to leave no room for contention or evasion. Let me quote from some of the cases. In one of the early cases, *Bloomer* v. *McQuewan*, 14 How. 539, after referring to previous cases which had marked the distinction between the grant of the right to make and vend a patented machine and the grant of the right to use it, the court said (p. 549):

"The distinction is a plain one. The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent. And when he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the patent confers. He obtains a share of the monopoly, and that monopoly is derived from, and exercised under, the protection of the United States. . . .

"But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of congress. And if his right to the implement or machine is infringed, he must seek redress in the courts of the State, according to the laws of the State, and not in the courts of the United States, nor under the law of congress granting the patent. The implement or machine becomes his private individual

property, not protected by the laws of the United States, but by the laws of the State in which it is situated. Contracts in relation to it are regulated by the laws of the State, and are subject to state jurisdiction."

Likewise in *Adams* v. *Burke*, 17 Wall. 453, the court, speaking through Mr. Justice Miller said (p. 456):

"In the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use. The article, in the language of the court, passes without the limit of the monopoly. That is to say, the patentee or his assignee having in the act of sale received all the royalty or consideration which he claims for the use of his invention in that particular machine or instrument, it is open to the use of the purchaser without further restriction on account of the monopoly of the patentee."

Yet, again, in the *Folding Bed Company Case*, 157 U. S. 659, 666, this court, reiterating the doctrine, said:

"Upon the doctrine of these cases we think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws.

"The conclusion reached does not deprive a patentee of his just rights, because no article can be unfettered from the claim of his monopoly without paying its tribute. The inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require illustration."

In view of the settled rule of this court, established by so many decisions, I might well refrain from referring to the English cases and the decisions of lower Federal courts relied on as persuasively supporting the doctrine now announced.  But, nevertheless, I shall briefly notice the cases.

I pass by the English decisions relied upon with the remark that it is not perceived how they can have any persuasive influence on the subject in hand in view of the distinction between state and national power which here prevails and the consequent necessity, if our institutions are to be preserved, of forbidding a use of the patent laws which serves to destroy the lawful authority of the States and their public policy.  I fail also to see the application of English cases in view of the possible difference between the public policy of Great Britain concerning the right, irrespective of the patent law, to make contracts with the monopolistic restriction which the one here recognized embodies and the public policy of the United States on that subject as established, after great consideration, by this court in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373.  See especially on this subject the grounds for dissent in that case expressed by Mr. Justice Holmes, referring to the English law, on page 413.

So far as the various decisions of Circuit Courts of Appeals which the court refers to are concerned, as they conflict with the many adjudications of this court to which I have referred, it seems to me they ought not to be followed, but should be overruled.  It is undoubted that the leading one of the cases which all the others but follow and reiterate is the *Button Fastener Case* to which I have previously referred.  I shall not undertake to review that case elaborately, because in substance and effect the theory upon which it proceeds is in absolute conflict with the many adjudications of this court to which I have referred, and the reasoning which was employed in the case, in my

opinion, in its ultimate aspect rests upon a failure to distinguish between the principle announced in *Wilson* v. *Sandford,* and followed and applied in the many cases[c] which I have reviewed, and the doctrine announced and applied in *Mitchell* v. *Hawley.* In other words, the *Button Fastener Case* and the confusion which has followed the application of the ruling made in that case was but the consequence of failing to observe the difference between the rights of a patentee which were protected by the patent and those which arose from contract and therefore were subject alone to the general law. In addition it may be well to observe that the very groundwork upon which the case proceeded has been since authoritatively declared by this court to be without foundation. For instance, it will become apparent from an analysis of the opinion in the case that it proceeded upon the theory that the doctrine upheld had been virtually sanctioned in previous adjudications of this court. Since the decision, however, this court, in *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339, 345, has expressly declared that the doctrine had never been upheld by this court. Moreover, also, in the *Bobbs-Merrill Case* this court, in considering one of the cases principally relied upon, in the opinion in the *Button Fastener Case*—the *Cotton Tie Case*—expressly pointed out that that case had been misconceived in the opinion in the *Button Fastener Case,* and did not have the significance which had there been attributed to it.

But even if I were to put aside everything I have said and were to concede for the sake of argument that the power existed in a patentee, by contract, to accomplish the results which it is now held may be effected, I nevertheless would be unable to give my assent to the ruling now made. If it be that so extraordinary a power of contract is vested in a patentee, I cannot escape the conclusion that its exercise, like every other power, should be subject to the law of the land. To conclude otherwise

would be but to say that there was a vast zone of contract lying between rights under a patent and the law of the land, where lawlessness prevailed and wherein contracts could be made whose effect and operation would not be confined to the area described, but would be operative and effective beyond that area, so as to dominate and limit rights of every one in society, the law of the land to the contrary notwithstanding.

Again, a curious anomaly would result from the doctrine. The law in allowing the grant of a patent to the inventor does not fail to protect the rights of society; on the contrary, it safeguards them. The power to issue a patent is made to depend upon considerations of the novelty and utility of the invention and the presence of these prerequisites must be ascertained and sanctioned by public authority, and although this authority has been favorably exerted, yet when the rights of individuals are concerned the judicial power is then open to be invoked to determine whether the fundamental conditions essential to the issue of the patent existed. Under the view now maintained of the right of a patentee by contract to extend the scope of the claims of his patent it would follow that the incidental right would become greater than the principal one, since by the mere will of the party rights by contract could be created, protected by the patent law, without any of the precautions for the benefit of the public which limit the right to obtain a patent.

I have already indicated how, since the decision in the *Button Fastener Case*, the attempt to increase the scope of the monopoly granted by a patent has become common by resorting to the device of license restrictions manifested in various forms, all of which tend to increase monopoly and to burden the public in the exercise of their common rights. My mind cannot shake off the dread of the vast extension of such practices which must come from the decision of the court now rendered. Who, I submit,

can put a limit upon the extent of monopoly and wrongful restriction which will arise, especially if by such a power a contract which otherwise would be void as against public policy may be successfully maintained?

What could more cogently serve to point to the reality and conclusiveness of these suggestions than do the facts of this case?  It is admitted that the use of the ink to work the patented machine was not embraced in the patent and yet it is now held that by contract the use of materials not acquired from a designated source has become an infringement of the patent, and exactly the same law is applied as though the patent in express terms covered the use of ink and other operative materials.  It is not, as I understand it, denied, and if it were, in the face of the decision in the *Miles Medical Co. Case, supra,* in reason it cannot be denied that the particular contract which operates this result if tested by the general law would be void as against public policy.  The contract, therefore, can only be maintained upon the assumption that the patent law and the issue of a patent is the generating source of an authority to contract to procure rights under the patent law not otherwise within that law, and which could not be enjoyed under the general law of the land. But here, as upon the main features of the case, it seems to me this court has spoken so authoritatively as to leave no room for such a view.  In *Pope Manufacturing Company* v. *Gormully,* 144 U. S. 224, the validity of certain stipulations contained in a license to use patented inventions came under consideration.  It was decided that contracts of that character, like all others, were to be measured by the law of the land and were non-enforcible if they were contrary to general rules of public policy.  And it was further held that even if contracts of that character were not void as against general principles of public policy, the aid of a court of equity would not be given to their enforcement if the stipulations were unconscionable and

oppressive, as are, in my judgment, aside from the rule of public policy, the stipulations of the contract here involved.

Indeed, when the decree rendered by the lower court which is now affirmed and which is excerpted in the margin [1] is considered, it seems to me the conclusion cannot be escaped that although in the mental process by which it was held that relief under the patent law could

---

[1] The Circuit Court granted a decree in favor of the complainant for an accounting of profits and damages and for an injunction restraining the defendants from infringing upon the said letters patent and "from directly or indirectly procuring or attempting to procure, inducing or attempting to induce or causing any breach or violation of the covenant, condition or obligation now existing or which may hereafter exist on the part of vendees or licensees of said patented and restricted rotary mimeographs to the complainant by reason of the license restrictions hereinbefore set out and particularly from directly or indirectly making or causing to be made, or selling or causing to be sold, or offering or causing to be offered, to any person or concern whatsoever, any supplies adapted for use or capable of being used on said patented or restricted mimeographs with design or intent that the same shall be so used in violation of such license restriction; from directly or indirectly persuading or inducing such persons or concerns to purchase any such supplies not of the complainant's manufacture and sale, designed or adapted for use in such machines for use thereon in violation of such license; from advertising or causing to be advertised in any manner any supplies intended or designed for use in said rotary mimeographs in violation of such license; from publishing or causing to be published any offer, promise or inducement designed or intended to procure licensees or vendees of the said patented and restricted rotary mimeographs to use or purchase for use in such machine supplies not of the manufacture of the complainant in violation of such license, and from doing and performing any and all other acts or things designed or intended to persuade or induce said licensees or vendees to violate the condition or covenant binding upon them with respect to the use of said rotary mimeograph and from in any way further interfering with the business of the said complainant of marketing said machines and supplies therefor under license restrictions limiting such machines to use only in conjunction with supplies made by or procured from said complainant.

be afforded the contract was treated as a restriction upon the use of the machine covered by the patent, so inexorable was the contrary result of the contract that in framing the decree it became necessary to give relief upon the theory that the gravamen of the suit was the violation of a contract stipulation in regard to unpatented materials.

For these reasons I, therefore, dissent.

