. PAIGE v. BROWN et al.

(District Court, E. D. Pennsylvania. October 31, 1919.)

No. 1791.

1. PATENTS ⚙⇒328—INFRINGEMENT OF MECHANISM FOR MAKING BIFOCAL LENSES.

The Paige patent, No. 1,260,022, for mechanism for making bifocal lenses, held not infringed.

2. PATENTS ⚙⇒241—INFRINGEMENT BY MACHINE CAPABLE OF REACHING SAME RESULT.

That a machine of a different type from that of a patent is adaptable for use as the patented type does not establish infringement, in the absence of evidence that it has been or was intended to be so used.

In Equity. Suit by Arthur E. Paige against Andrew V. Brown and Mary E. Brown, trading as D. V. Brown. On final hearing. Decree for defendants.

Arthur E. Paige, of Philadelphia, Pa., in pro. per.

Harrison F. Lyman, of Boston, Mass., Joseph C. Fraley, of Philadelphia, Pa., and Fish, Richardson, Herrick & Neave, of Boston, Mass., for defendants.

DICKINSON, District Judge. The plaintiff is influenced naturally, and indeed necessarily, by a situation which has no evidential value and is not very clearly reflected by the evidence. It is, however, this: He had negotiated and reached an agreement, and had tentatively made it, with one of the counsel (none of the present counsel however) for the defendants. By this agreement, if defendants had made it, the defendants would have used plaintiff's machine under a license and upon terms accepted by both parties. We make no finding of this fact, because there is no evidence of it in the cause, and in the nature of things could not be. Without intending any play upon words, although there is no evidence of it in the record, it is none the less evident that the plaintiff dealt with the defendants in the reasonable expectation that some such agreement would be made. It was not made, and of course the defendants were within their legal rights in refusing to make a contract, no matter how far (short of an agreement) the negotiations had been carried. We have no thought of criticism of the defendants in mind. The to-be-expected effect of this and other things, however, was to make the plaintiff suspicious of the defendants, and, when he found they had put out what is known to this record as defendants' machine, he drew his own inferences of the motives and conduct of the defendants in doing whatever they did. His inference, as again to be expected, was that, instead of buying from him, they had taken the inventive ideas, which were his property, and which he had brought to them, and had designed a machine which was the equivalent of his machine, but had cleverly constructed it so that the principles of its construction would seem to differ from the principles on which his machine was made to operate.

⚙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This attitude and state of mind of the plaintiff, coupled with the other feature of the case, that he has himself conducted the trial without the assistance of counsel, has added to the difficulties of the trial judge. Being in the state of mind in which he was, it was impossible to keep down the expression of the feeling of injustice done him, with which he was filled, and although at all times he was careful to exclude, so far as possible, opposing counsel from incrimination (and the plaintiff and opposing counsel are to be commended for the dignity and courtesy which they have displayed throughout the trial), it was again impossible for the defendants to refrain from angry retort and recriminations. So far as could be done, these by suggestion and ruling have been kept out of the record. It is one of the duties of a trial judge to get into sympathy with each party to a controversy, so as to understand his attitude and through this his point of view. We in consequence, feel toward the plaintiff this measure of sympathy, even when we do not share his suspicions.

The trial of this cause, largely for the reason intimated, has taken a very wide range, and the discussion an even wider one. Many issues have been raised which ordinarily would call for discussion and length of discussion. The record is very voluminous, and as the argument was held some time after the trial, and time had to be given to prepare paper books, this necessitated taking the time to go over the entire record. We felt the duty of doing this, because the first impression received was that the one issue of infringement was the controlling issue in the cause, and none other need be considered. Before adhering to this first view, we felt that we should review the whole case, and this we have done. The result is our first impression is confirmed.

We state the conclusions reached with some diffidence, because they involve wholly a mechanical construction with its principles of mechanical operation. There is a type of mind which, if not wholly devoid of mechanical ideas, does not take kindly to them, and comprehends them with difficulty, and is without that power of imagination which, given the idea, at once constructs a machine embodying and applying it. To get the point upon which this case is ruled, we need to know only two types of machines with which this case concerns itself.

The machines with which we are concerned are mechanisms for shaping ophthalmic glasses. The letters patent are No. 1,260,022, bearing date March 19, 1918, and relating back to an original application filed March 4, 1915, and carrying the serial number 12,028. The original application was divided, and the application upon which the grant of letters was made was filed July 4, 1917, and bears the serial number 178,523.

To enable one unfamiliar with the art to get an intelligent grasp of the question of infringement involved, a number of general conditions and principles affecting the art must be understood. The motive (aside from the commercial one and entering into this) which induces the effort to promote the art is to provide artificial aids to and means for correcting defects in human vision. These objects are accomplished by

interposing between the eye and the objective of vision a transparent glass lens, to which has been given the proper form of surface. Generally classified, these forms are spherical, cylindrical, and toric. As the objective of vision may be near to or remote from the observer, we have the classification of near sight and far sight. This brings to those concerned with the development of the art, as one feature of the problem presented to them, the necessity of the convenience of providing for near sight and far sight in one glass or lens. A very common defect in vision is astigmatism, a correction for which must also be provided through and by the forming of the lens. The ultimate end to be reached by making glass adapted to the use of the individual user can be reached only through and by calling in the aid of the knowledge and skill of the oculist and predetermining the kind of glasses required. Out of this has grown the practice of making glasses to conform to prescription.

The general methods of the art are to first form the glass into plates of a convenient size and mold them into a rough similitude of the form they are finally intended to be given. They are then called "blanks." The glass is then, by grinding, made to assume common prescribed forms, at least approximately adapted to different desired uses. The lenses in this form are sold to opticians, who grind them to conform to what has been prescribed for the individual who is to use them. This art, as every other, has its own nomenclature. Those engaged in supplying lenses to the opticians are called manufacturers of lenses. The most generic term applied to the process of perfecting lenses is "surfacing," although "grinding" is also a term employed. Shop terms are employed to designate different steps of the process, and we have rough grinding, surface grinding, and polishing. To enable the user of glasses to look at objects near at hand, or at distant objects, or those intermediately placed, without changing his glasses to accord with the distance, he is given what are really two glasses in one. In the common phrase, when he looks through one part of the glass there is one focus, and when he looks through another part of the glass there is another focus. Devices enabling him to do this have been successively, and perhaps in merit progressively, brought into use.

The means of meeting the relatively simple problem of providing what are commonly called reading and distance lenses in the same glass may be used as an illustration of the different devices to which resort has been made. They are common in the respect that the reading lens is placed in the lower part of the glass. One device is to form the surface of the glass as a distance glass, and then above its lower edge to attach upon it a circle or segment of glass, the surface form or composition of which makes of it a reading glass. Another device is to cut out of this distance glass, in a like part of the glass, a circle or segment, and insert in this aperture another glass, which is fused with the distance glass, and forms in itself the reading glass. This make of glasses or spectacles is known by the trade-name of "Kryptoc."

Another device or method, and the one with which we are more particularly concerned, is to take one piece of glass, grind the upper portion into a surface form which will make of it a distance glass, and

grind the remaining portion, corresponding to the circle or segment before mentioned, into a surface form which will make of it a reading glass; the ridge formed by the meeting line being so disposed as, so far as it is possible, to minimize its effect as an obstruction of vision.

All these glasses have a common purpose and a common character, in that they are bifocal. They are designated in the art, and in the trade which follows the art, by appropriate names. One part of the art concerns itself with the making of means or mechanisms for doing what is above described as necessary to be done in giving to glasses, which reach the customer, their final form.

The principle of operation by which the surface of a glass is made to take a prescribed form is interesting to one who is a novice in the art. There are two principles of operation, either of which may be employed. One is known as the lap tool method, and the other as the ring tool. The operation by which each of these principles is brought into play, in the general use of it, is as follows:

The glass, the surface of which is to be ground into a shape, is brought into a closely approximated contact with the abrasive tool, with emery or other abrasive substance interposed, so as to make contact. The grinding power is supplied by having the tool attached to a revolving spindle, and the glass attached to a like tool, which is also revolved. The grinding tool and the glass to be ground must of course be kept in contact, notwithstanding the recession caused by the grinding of the glass and the wear of the tool. A method, although not a practical way of doing this, would be by successive manual adjustments from time to time as the progress of the operation called for them. Another method would be by providing some mechanism by which the glass and tool would be automatically kept in contact and adjust themselves to the proper relation as the work progressed. Another method would be to provide for such automatic adjustment required because of the recession of the surface of the glass, and manually readjust the tool when necessary because of its recession through wear.

Whatever method is employed, it is obvious that the mechanism must be so constructed as that the tool is made movable, so that it may approach the glass, or the glass be made to approach the tool, or both be capable of such advances. This brings in, at least theoretically, possible variations. The tool-carrying mechanism may be made rigid, and the glass-carrying mechanism thus movable, or these capabilities may be reversed, or both may be made movable.

There is also a difference, as before stated, in the tools used and in the principle upon which they operate. By the lap tool method the tool employed must have the form prescribed for the glass to be ground, because the form of the tool determines the form of glass surface produced. Reduced to its simplest statement, this process and method involves nothing more than bringing the glass into abrasing contact with the tool through the medium of emery or other grinding material. If the instruments employed in this process are conceived of as a tool having, for illustration, a concave, spherical face, and a piece of glass, together with emery or other abrasive material in proper placement, and the glass is rubbed upon the tool, or the tool upon the

glass, or both, and the pressure is applied, so that it may affect equally every part of the concave surface of the tool, the glass will take a convex form, exactly corresponding in reverse to the form of the surface of the tool.

It is clear that by this method the tool and glass cannot be held in any fixed relation with respect to the point or line of contact being indicated by the angle formed by the intersection of the axis of rotation of the tool and glass, respectively, but the tool and glass must be left theoretically and practically, as nearly so as possible, free to change such relation at any and all times.

A corollary proposition is that a different tool must be employed to grind when the surface to be ground is different. By the ring tool method this latter proposition does not hold good, and the same tool may be made to grind a surface of any prescribed curvature. This is because the form of the surface ground is controlled by the operation of a wholly different principle. The principle is this:

That when the line of the axis of rotation of the tool is disposed at an angle to the line of the axis of rotation of the glass, the form of the spherical surface generated is determined and measured as a spherical surface corresponding to a sphere, the radius of which is exactly equal to the distance from the point at which the line of these axes, if produced, would intersect, to the surface to be ground. The corollary proposition flows from this that the relation between the lines of these axes must be predetermined, so as to result in the prescribed form of surface, and must be kept theoretically, absolutely, and practically, as nearly as possible, fixed and rigid.

A further necessity of the use of these methods is that the parts of the mechanism required to be adjusted to different uses must be adjustable so that, for illustration, these axial lines may be concentric, may be eccentric but parallel (in which case a plane surface would be produced) or disposed at an angle by which a predetermined curved surface may be produced.

There may be another different or alternative feature of the operation of the tool, in that the line of the axis of the tool may be disposed of at an angle with the line of the axis of rotation of the spindle to which the tool is attached, so as to impart a planetary movement where the tool and glass come in contact. In such cases the contact of tool and surface is not a point contact, but a line contact. By the ring tool method the desired concavity or convexity is secured by the axial intersection referred to being above or below the surface to be ground.

The inclusion of the number of different features which are given to mechanisms of the general kind indicated brings into the make-up of these mechanisms a complexity which is confusing to minds untrained to the reception of ideas of mechanical construction.

[1] With the state of the art, such as above generally described, the plaintiff made his first application for letters patent. The novel, useful idea, upon which he claimed to have come, he describes in his application as an "improvement in mechanisms for making bifocal lenses." What he had in mind evidently was the construction of a mechanism which would produce curved surfaces and especially and more par-

ticularly two differing ones on the same glass, so related to each other that they would adjoin in the sense that the one would begin where the other left off, and each would carry the curvature peculiar to it up to the junction line, thereby sharply defining it. In this statement we have paraphrased the language of the application.

Another thought is that the operation of this mechanism takes in the expedient of grinding out of one piece of glass two bifocal lenses at the same time. This is accomplished by holding the glass to be ground in such manner that what becomes the minor area in one of the two lenses when ground is next to what becomes the minor area in the other lens when ground, and these minor areas are between what become the respective major areas of the lenses when ground. The grinding is accomplished by having as part of the means by which the grinding is done a tool which has an annular abrading surface, the line of contact movement between which and the glass is transverse. A sharply defined junction line between tthe minor and major areas of each lens is obtained by having the glass ground in a direction obliquely transverse to this line. This obliqueness is brought about by having the axial lines of rotation of the glass and the tool disposed to each other so as, if produced, to form an angle. In the grinding of the minor areas this axial relation is preferably maintained; but in the grinding of the major areas, in order to reduce the danger of the scratching of the glass the abrading material which travels with the tool should be moved crisscross of the movement of the abrading material which travels with the glass.

Another thought is to have the mechanism so adjustable as to afford the advantage of capacity to make compensation for the wear of the tool.

The claim is advanced that a conoidal shaped lap may be made to produce a spherical surface of the radius of curvature corresponding to the transverse curvature of the tool (without regard to its circumferential curvature), and to the extent to which use increases the convexity of the lap the line of contact may be shifted, so the spherical curvature may be changed from one which corresponds to the first radius of the curvature of the lap to the one which corresponds to the less radius. The limitation of this adjustment is controlled by the presence of the minor lens areas.

The claim of invention is for an "improvement in surfacing mechanisms." The mechanism claimed to have been invented is generally described as one so constructed and adjustable as to accomplish all the results before described which are gained when the ring tool method is employed, and, with one exception, all the features thus generally described, and as particularly described and illustrated in the drawings, call for a mechanism to be operated upon the ring tool principle.

The exception referred to is the modified arrangement by which the movement of the tool with respect to the glass may be planetary. This arrangement is illustrated in Fig. VII.

We need, because of this and the principle of operation of defendants' machine, inquire no further into that branch of this art, which concerns itself with the construction of machines, than to get firmly

into our minds this distinction between the two methods, known as the lap and the ring tool. The essential, or at least one essential, difference and distinction is this freedom of movement or "wabble" in the lap tool method, and this fixity of relation in the ring tool.

The defense to the charge of infringement is broadly stated that the plaintiff's machine belongs to the one class and the defendants' to the other. The reply is that this general character of defendants' machine is assumed for the sole purpose of escaping the charge of infringement, and that it is so constructed that by manipulation it can be and is intended to be operated as is that of plaintiff. To demonstrate this the plaintiff has shown how this, as he claims, may, and, as he charges, is intended to, be done.

The moment we get beyond this finding of infringement, and seek to follow the parties in their further controversies, we are lost in a maze, as well as multitude, of issues, the discussion of which is well-nigh interminable. We have given up in despair the attempt to adequately state, much less discuss, them. For this reason we content ourselves with a finding upon this question.

[2] We are not wholly sure that we are doing full justice to plaintiff's position in the view of it which we have taken, due to a failure to grasp the thought with which the plaintiff has met this defense of a denial of infringement; but it seems to come down to this: That the defendants' machine may readily and easily be changed from the type to which it in the first instance belongs to the type to which plaintiff's machine belongs. More than this possibility, or even adaptability, of use is required to establish infringement. Infringement is a fact, not an abstraction or a possibility. We are referring to the stop mechanism of which so much has been said. Whitney v. New York, 243 Fed. 180, 156 C. C. A. 46.

Plaintiff, of course, appreciates this, and seeks to have added to a finding of adaptability the further finding of an intent and purpose to have the infringing machine so used. This would bring the present case within the principle recognized in Henry v. Dick, 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880.

Such intent and purpose, if it existed, would certainly bear fruit in such infringing use. Until some one has infringed, such intent and purpose, if it could be established, remains an intent to infringe, and is not an actual infringement, and clearly, in the absence of a confession, no finding of an intent to do a thing which it is averred can readily be done, which there has been ample time to do, would be justified, in the absence of evidence that the thing had been done. At all events, no injunction is ever awarded on the mere showing that the thing to be prohibited is within the power of the defendant to do, and this is emphatically so when there has been ample time and opportunity for him to act, and he has so far refrained, and still more emphatically is this so when the doing of the thing is something for which the defendant may be called upon to respond in damages, and money damage is the sole injury which plaintiff suffers.

This explanation should be given, in order that some of the foregoing statements may be intelligible. The defendants of record in

the case compose a firm doing business in Philadelphia. The machine alleged to be an infringement of plaintiff's machine is made by the American Optical Company of Southbridge, Mass. The latter company conducted the defense, and took upon itself the whole burden of the defense, so that the case was tried as if the Optical Company had been the defendant. The distinction between the nominal defendants and the real defendant, by the stipulation of the parties, has no significance. It is mentioned, as before stated, merely to explain why it is that the defendants are treated as if they had made the infringing machine.

We find against the plaintiff, on the ground that defendants have not infringed, and dismiss the bill solely on this ground, with costs to plaintiff.

We will follow the practice in this case of not now dismissing the bill, but granting leave to parties to submit a formal decree to this effect. This is done, so that the date of decree may be a definite one.